**CENTRAL OF GEORGIA RAILWAY COMPANY, Plaintiff,**

v.

**UNITED TRANSPORTATION UNION(S), an unincorporated association, et al., Defendants.**

**Civ. A. No. 2671.**

United States District Court,
S. D. Georgia, Savannah Division.

Jan. 9, 1973.

A. Martin Kent (Miller, Beckmann & Simpson), Savannah, Ga., E. Edward Bruce, Charles A. Horsky (Covington & Burling), Washington, D. C., for plaintiff.

Clarence M. Small, Jr. (Rives, Peterson, Pettus, Conway & Burge), Birmingham, Ala., A. Pratt Adams, Jr. (Adams, Adams, Brennan & Gardner), Savannah, Ga., for defendants.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I

LAWRENCE, Chief Judge.

Hostlers move "light" engines (that is, engines to which cars are not coupled) to and from shops, roundhouses, passenger sheds, fueling stations and other points in and near railroad yards. Hostler helpers assist and perform such incidental duties as throwing switches and giving hand signals. Switchmen throw switches, give signals to enginemen and perform other services connected with switching. Their work is on the ground, not on engines. Historically the hostler and switchmen crafts have been represented by different unions.[1]

1. Prior to 1969 switchmen employed by Central of Georgia Railway were members of Switchmen's Union of North America (SUNA). The hostler craft was represented by the Brotherhood of Locomotive Firemen and Enginemen (BLF & E).

The identifiability of the respective functions is ordinarily clear. In penumbral areas, however, there is frequently uncertainty. The problem is accentuated by the fact that labor contracts and customs vary from yard to yard within a single rail system. The right to do work is governed by agreements and practices applicable to the property on which the dispute has arisen. These factors as well as the jealously-guarded divisions of labor in a complex industry is the genesis of the present litigation.

Central of Georgia Railway Company (Central) has filed a petition for review of an award made in October, 1969, by a Special Board of Adjustment organized pursuant to the Railway Labor Act as amended. 45 U.S.C. § 151 et seq. The defendants are United Transportation Union (UTU), Switchmen; a local official thereof and three individual employees who were made parties as representative of the class of "yardmen" (switchmen).

The defendant Union representing the switchmen asks full or, in the alternative, partial enforcement of the award of the Special Board sustaining the allowance of certain claims of switchmen at Savannah. See 45 U.S.C. § 153 First (q). Both sides have moved for summary judgment on the pleadings, record, depositions, answers to interrogatories, affidavits and exhibits.

The record in this case is voluminous. The depositions cover more than 200 pages and there are some 550 pages of pleadings, exhibits, labor contracts, the record before the Special Board, copies of awards in other jurisdictional disputes, correspondence and interrogatories and answers.

The claims originated in 1962 when Switchmen's Union of North America (SUNA) filed grievances against Central on behalf of three switchmen-employees. It claimed that the men were rested and ready to work in the early hours of May 1, 1962, but, despite their right to perform the work, a hostler and hostler helper (BLF&E) placed a passenger train under the passenger shed at Savannah. Numerous grievances by switchmen were subsequently filed by SUNA. The claims were declined by Central.

In 1963 the controversy over the use of hostler and hostler helpers in performing duties to which switchmen claimed contractual entitlement was submitted by SUNA to the National Railroad Adjustment Board. The claims involved work in turning passenger trains on the wye, placing passenger engines into the shop for servicing, and the carrying of light engines from Bay Street crossing to the shop yard. The latter (third) type of work did not involve passenger trains but related to light freight and yard engines operating in the yard area of Central at the Bay Street viaduct.

## II

The Railway Labor Act (45 U.S.C. § 151 et seq.) created a National Railroad Adjustment Board, conferring jurisdiction upon it in disputes involving, among other crafts, engineers, firemen, hostlers, and outside hostler helpers and yard service employees. A backlog of disputes clogged the dockets of NRAB. It was eight to ten years behind in the disposition of minor claims growing out of railroad bargaining agreements. In 1966 the Act was amended so as to provide for the establishment of special adjustment boards upon written request of the representative of any craft or of any carrier in order to resolve disputes otherwise referable to NRAB. The Amendment was intended to provide an efficient alternative to processing minor disputes through the permanent Board. Brotherhood of Locomotive Engineers v. Denver & Rio Grande Western Railroad Company, D.C., 290 F.Supp. 612, 619–620, aff'd 411 F.2d 1115 (10th Cir.).

Special or "Public Law" boards consist of one representative of the carrier and one of the employees. If they are unable to agree, they "shall by mutual agreement select a neutral person to be a member of the board for the consider-

ation and disposition of such dispute or groups of disputes." The temporary boards are empowered to make "final and binding" awards. 45 U.S.C. § 153 First (m), (p), (q) and § 153 Second.

In 1967 G. T. DuBose who at that time was SUNA's General Chairman for the yard switchmen on the Central property requested that a Special Board of Adjustment be established under the Act since the claims of employees represented by SUNA had been pending before NRAB more than twelve months. The Carrier took the position that third party participation by the hostlers was necessary. On February 4, 1968, General Chairman Billy E. Moore (SUNA) was advised by Vice President of Personnel Tolleson of Central that it objected to the form of agreement submitted as respects "possible third party disputes." He sent Mr. Moore a rough draft of a clause deemed appropriate in that respect. See p. 3 of defendant's answers to interrogatories. The draft provided that where it is determined that a third or additional party may have an interest in a dispute, it shall be given notice and opportunity to appear before the Public Law Board. SUNA seems to have disagreed as to the necessity of third party participation. It appears that there were negotiations.[2] The third party provision of Central's draft was not incorporated in the formal PL board agreement entered into by the parties on March 14, 1968.

As of January 1, 1969, SUNA and BLF&E were merged into a new organization called United Transportation Union. The Order of Railway Conductors & Brakemen also became part of UTU. See deposition of Charles A. Luna, President, p. 9. The merger did not affect the autonomy of the various crafts which was preserved by the merger Agreement. The Grievance Committee of SUNA which had handled labor disputes between Central and switchmen employees was merely renamed. Mr. Moore was General Chairman of the yard employees. A. B. Healan was General Chairman of the enginemen craft, including hostlers. The labor contracts between the three constituent Unions and the Carrier remained in effect. All officers and functional leaders remained the same. See letter of Billy E. Moore to Central, January 13, 1969. Exhibit E, Central.

The Agreement establishing Special Board No. 217 recited that the claims and grievances to be decided by it were attached as "A." The attachment in question is unfortunately vague. It merely listed the cases to be "withdrawn" in five docket numbers.

Jacob Seidenberg was agreed upon as "Chairman and Neutral Member" of PL Board No. 217. Dr. Seidenberg is experienced in railroad labor law.

### III

The Award was handed down on October 2, 1969. It sustained all the claims of the switchmen. General Chairman Moore (Switchmen) concurred. The Carrier Member dissented. The claim was thus defined in the Award:

"Statement of Claim: 'Claim is made for J. C. Beasley, Foreman, D. M. DeLoach and W. M. Anderson, Switchmen, Savannah Yard, for one day's pay at pro rata rate account of Hostler and Hostler Helper performing Switchmen's duties on May 1, 1962.

'Above named Claimants are identified as Carrier's Docket SU 9393.

'Claim is also made for all crews in the following Dockets, said Dockets

2. Mr. DuBose executed an affidavit stating that Central was given the opportunity as to the Hostler's assistance and participation in the special board proceeding. This offer was declined by the Carrier, DuBose claims, on the ground that it was not necessary. Central's representative informed DuBose that it was entirely capable of defending its position. In a counter affidavit, Central's Director of Labor Relations, Glenn W. Certain, denied that there was any assent to the participation of the Hostler craft in the hearing as well as the contention that the Carrier believed that such participation was unnecessary.

being similar in nature and involving the use of Hostler and Hostler Helper in performing Switchmen's duties: Dockets SU 9394 through SU 9423, SU 9424 through SU 9453, SU 9455 through SU 9477, SU 9478 through 9490, SU 9491 through SU 9559, SU 9728 through 9817, SU 9892, SU 9895, SU 9914, SU 9915 and SU 9916.'

'Discussion: The parties stipulated at the December 2, 1968, hearing of this Board that the following listed SU Dockets would be governed by Award No. 1 of this Board. These Dockets are:

| | | | |
|------|------|------|-------|
| 1423 | 1325 | 1199 | 1294 |
| 1341 | 1181 | 1201 | 1307 |
| 1342 | 1183 | 1256 | 1309 |
| 1324 | 1193 | 1257 | 1315 |
| | | | 1319.' " |

Dr. Seidenberg stated at the outset of the Special Board's Award, "The gravamen of the dispute is whether Outside Hostler and Hostler Helpers are contractually entitled to handle light Passenger Engines to and from the Passenger Station at Savannah." The Neutral Member seems to have assumed that the case before the Special Board was confined to services connected with light passenger engine movements. Apparently the Chairman was not the only one who assumed that such was the only issue. General Chairman Moore representing the switchmen testified in a deposition taken after the Award that the "primary dispute by both the railroad" and "our side of the table" was "the movement of passenger engines from the shop to the passenger shed." Deposition, p. 138. "[W]hat we were primarily interested in in this claim was that it applied to the movement of these passenger trains back and forth between the shop and the passenger shed." P. 170 "[T]he thrust of the argument . . . dealt primarily and exclusively with that issue insofar as I know." P. 164. In respect to the scope of the Award Mr. Moore testified that the claim by the switchmen never deviated from "one point," namely, the movement of light passenger engines between the shop and the passenger station. Deposition, p. 77.

Mr. Moore was of the opinion that the claims of switchmen for other than light passenger engines were "similar in nature" to the original prototype claims of Beasley, DeLoach and Anderson for the work they allegedly were deprived of on May 1, 1962, in respect to the light passenger engine movements described. The similarity was "based on the fact that they had been included in the submission to the board for adjudication." Moore deposition, p. 152. To like effect, General Chairman A. B. Healan who represented Central's hostlers testified in a post-Award deposition that the *ex parte* submission of the switchmen related *only* to passenger trains. "I take it that was the only thing that was involved." "[T]he only thing I can get out of it, they were talking about the passenger train and engines between the shops and terminal in Savannah." Deposition of Healan, pp. 10–11.

Following the Award, an analysis of the claims that were submitted to the Board was made by George E. Anderson, a labor relations officer of Southern Railway who was familiar with the Savannah situation. The total number of time claims filed by SUNA in 1963 was 561. Of these 286 related to the movement of yard and freight engines at Savannah and did not involve movements of light passenger engines between the shop and the passenger shed. Affidavit of Anderson, June 5, 1972. This analysis is concurred in by the defendant Union. The record indicates that the total amount involved in the Award was around $110,000.

After the Award was handed down the Carrier requested an interpretation thereof by the Board. It asked that the hearing be reopened so that the hostlers could be afforded an opportunity to appear and present their side. The Carrier contended that it was entitled to a board award which would protect it by binding both switchmen and hostlers so that an end could be brought to the dispute.

General Chairman Moore (switchmen) denied that any third party interest was

involved. He contended that any question in that respect had been conclusively determined between the hostlers and switchmen "by the chief executive officer and his subordinates of the United Transportation Union." Charles Luna was President of UTU at that time. Assistant Vice President Loomis of the Southern Railway System (Central) wrote to him concerning the problems raised by the Award. On October 22, 1969, Mr. Luna sent a copy of Mr. Loomis's letter to General Chairman Moore with the comment that there was no jurisdictional dispute since "all claims only involve an interpretation of the BLE agreements." He disagreed with Central's contention that the Award "gives the Switchmen the right to handle hostler and hostler-helper work." According to Moore, the claim "calls strictly for an interpretation of the agreement relating to yard employees, namely, Switchmen."

On December 18, 1969, President Luna informed the Carrier that "any alleged jurisdictional questions that may arise between Committees of the UTU will be handled by the organization internally and will not be submitted to a Public Law Board for determination." He commented, "I fail to understand the position you are now taking by now challenging jurisdiction after you lost the case. It might be interesting to know whether you would have maintained the same position had the award been such that it denied the claims." [3]

On May 8, 1970, the Board filed an "Interpretation of Award No. 1." It denied the request to reopen the hearing. The Interpretation stated:

"The Carrier is in error in denominating the instant dispute as a jurisdictional dispute involving a third party interest. There is only one Organization concerned with this dispute, the United Transportation Union, representing all the employees involved having an interest herein—both actually and potentially . . . [T]he Board finds here that not only is there just one Organization involved in the dispute but the Chief Executive Officer has formally stated that any jurisdictional dispute between the employee groups will be handled internally. It is difficult to understand how the Carrier could be subsequently disadvantaged under these arrangements."

The Board said that the Carrier had waived any right as to notice and opportunity to be heard in respect to third parties and upheld the "propriety or legitimacy" of the Board in considering the substantive issues involved.

## IV

Central lays great store by *Transportation-Communication Employees Union v. Union Pacific Railroad Co.*, 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966). Since that decision is the principal basis of the Carrier's claim that the Public Law Board No. 217 was without jurisdiction and that its Award in favor of the switchmen was invalid, a look at it is in order. In that case a jurisdictional dispute arose between two unions as a result of the advent of IBM machines. Automation eliminated the work of employees who were members of the Transportation-Communication Union (telegraphers) and the Brotherhood of Railway Clerks. The Carrier awarded the clerks the work of manually operating the machines that had displaced the former jobs. The telegraphers' Union brought the controversy to the Railroad Adjustment Board.

---

3. See Exhibit "C". On the same day Mr. Luna informed General Chairman Healan (hostlers), "I cannot see that there is any dispute between the Committees." He recommended that the respective Chairmen "consult" with each other. President Luna's attitude toward jurisdictional disputes with railroads is interesting. "Through my years in this business, I have found out that 90 percent of the carriers who determine who is not going to work is caused by the pigheadedness of the carrier." "Q. What about a carrier's allegation of jurisdictional dispute? A. I could care less." Luna deposition, pp. 35, 61.

Without requiring the Brotherhood of Railway Clerks to become parties (they refused a proffered opportunity to participate, claiming no interest in the result) the Board concluded that the telegraphers were contractually entitled to the work and ordered back pay.

The Supreme Court held that the Board should have heard and decided the conflicting claims of both unions and that it had abdicated its duty to settle the entire dispute. The fatal flaw in the award was that it necessitated a separate determination of the claims of the two unions to the same work. Both of the organizations could not possess, under their respective agreements, the right to perform the new work. Nor could NRAB postpone resolution as to which union had the right to the work in the future. When presented with a jurisdictional dispute under the existing contract, the Board must join the third party union in the proceeding before it. The Court remanded the case with instructions that the Adjustment Board resolve the entire dispute arising out of the labor agreements.

In its "Interpretation of Award No. 1" PL Board No. 217 differentiated *Union Pacific* on the ground that no third party interest was involved in the Central case since only one organization was "concerned with this dispute, the United Transportation Union, representing all the employees having an interest herein." See p. 2. In the brief submitted by General Chairman Moore on behalf of the switchmen he similarly argued that there could be no jurisdictional dispute because "there are not two unions involved but rather one." P. 10. Moore later testified that "it is difficult to see how you can have a labor jurisdictional dispute between the carrier and one union." Deposition, p. 60.

The merger agreement under which SUNA and BLF&E became part of United Transportation Union made little change in the respective bargaining representation of the switchmen and the hostler crafts. If a jurisdictional dispute exists, the instructions of the President of UTU contained in his circular dated April 10, 1969, require the respective General Chairman to appear before the PL Board and give their interpretation of the agreement. The Circular states that since "craft autonomy" is a condition of acceptance of unification "all concerned must carefully protect this inherent right when handling cases in a Public Law Board." "[W]e let both parties present their side of it to a referee or a neutral. Then he decides whether the claim should be sustained or should be denied." Luna Deposition, p. 97. The purpose behind the Instructions was that craft autonomy and disposition of jurisdictional disputes before special boards be "carefully protected" when it is determined that a jurisdictional dispute exists. Luna Deposition, pp. 84–85.

The ruling of the Special Board that no jurisdictional dispute could exist where a single union represents both affected crafts is patently erroneous. In fact, the point is not pressed in the brief of UTU filed in this Court. Such a contention ignores reality. A merger of unions does not rule out existence of a jurisdictional dispute involving constituent crafts. In such a case a final and binding disposition of the entire dispute should be made in a single proceeding before the Special Board. To accomplish this the hostler craft should have had notice and opportunity to participate. Since the members of that craft could be adversely affected by the board's ruling it was an "involved" party. See Estes v. Union Terminal Co., 89 F.2d 768, 770 (5th Cir.); Kirby v. Pennsylvania R. Co., 188 F.2d 793, 798–799 (3rd Cir.); Townsend v. National Railroad Adjustment Board, D.C.Ill., 117 F.Supp. 654, 658.

V

In its brief United Transportation Union distinguishes *Union Pacific* from the instant case. Firstly, it maintains that that decision dealt with procedural responsibilities of the Railroad Adjustment Board itself and not with those of

special boards. A critical distinction exists, it says, in regard to their respective obligations concerning procedural duties. This contention has to do with its argument that Central waived third party participation in the hearing.

Secondly, it is contended that *Union Pacific* does not apply to any dispute concerning the switchmen's claim to work connected with light passenger engines because the hostler craft disavowed any claim thereto.

(1) Defendant maintains that the 1966 amendment to the Act shifts to special boards the procedural duties that are normally required of NRAB. Where a carrier takes no affirmative steps in respect to the joinder of "allegedly interested third parties" it cannot complain, says UTU, of its own shortcoming. The Union asserts that omissions of Central in this respect were not mere oversight but that "the scheme was undoubtedly to 'sandbag' the Union by trying the case with what the Central conceived to be 'built in error.'" I profess not to understand all that the Carrier did or did not do in connection with the submission to Special Board No. 217. I will only comment that neither Central nor UTU is in position to proclaim, "Stand by thyself, come not near me; for I am holier than thou."

The special boards authorized by the 1966 Amendment are an alternative or substitute statutory forum for NRAB. Congress intended that in the case of disputes such a board would possess similar and coextensive powers. See Brotherhood of Locomotive Engineers v. Denver & Rio Grande W. R. R., supra, 290 F.Supp. at 620. It seems to me that a Chairman-Neutral Member of a special board should undertake, to the extent of his authority, to see that the issue before the tribunal is clearly defined. The statute provides that the cases to be decided by such boards "shall be defined in the agreement establishing it." The responsibility is basically that of the parties. However, the role of the Neutral Member is not necessarily a passive one. As chairman he should seek to make certain that no conflicting third party interest is involved.

In the "Interpretation of Award No. 1" the Neutral Member stated that the Agreement of the parties did not provide for any notice or opportunity to third parties to be heard and that no issue as to any procedural question was timely raised by the carrier. Reference has been made to the fact that Central's answer to the *ex parte* submission on behalf of the switchmen stated that there was a "distinct jurisdictional issue." Carrier pointed out that "an award in favor of the employees would place it in the untenable position of facing conflicting claims from two crafts for the same work." Pp. 12–13. On its face the Award indicates a jurisdictional dispute. It states that the Organization (SUNA) "contends that the work in issue belongs to members of its craft and not engine service employees." The Award further recites that the Carrier contended that a jurisdictional dispute existed if the claim were sustained. Award, pp. 1–2, 10–11.

Where a third party interest is involved the fact that the creating agreement does not deal specifically with notice to other parties is not a waiver of procedures mandated by *Union Pacific*. The hostlers should not be prejudiced by the failure of Central and SUNA to include such a clause therein. The Adjustment Board is required to give notice of all hearings to employees "involved in any disputes submitted to them." 45 U.S.C. § 153 First (j). Public Law Boards have no less a responsibility. See Transportation-Communication Employees Union v. St. Louis-San Francisco Railway Company, D.C.Mo., 296 F.Supp. 507, 511; appeal dismissed on other grounds, 8 Cir., 419 F.2d 933, cert. den. 400 U.S. 818, 91 S.Ct. 34, 27 L.Ed.2d 45.

(2) The Supreme Court stated in *Union Pacific* that there is no necessity of a union's presence where the other labor organization chooses "to surrender its claims for its members." 385 U.S. at 164, 87 S.Ct. at 373. Insisting that the

Central hostlers abandoned any claim involving movements of light passenger engines, UTU argues that no "viable" inter-craft dispute exists as to past or future rights to such work. The waiver by UTU (hostlers) of any claim to such work is not notable for unselfishness. By 1968 passenger service on the Central was almost defunct. Only the "Nancy Hanks" remained and by the end of the 'sixties its days were clearly numbered.[4] Central had awarded the work at issue to the hostlers. They had been paid for same and no one could get the money back.

The statement of the claim of the switchmen as submitted to Special Board No. 217 recited that in addition to the one for May 1, 1962, "claim is also made for all crews in the following dockets . . . being similar in nature and involving the use of Hostler and Hostler Helper in performing Switchmen's duties."

How the freight engine claims could be "similar" to those involving movements of light passenger engines eludes me. The position of United Transportation Union in this respect is ambivalent. It says that the submission included both light freight engine movements as well as those of light passenger engines and that since the Award upheld *all* of the claims it must be sustained in its entirety. However, apparently recognizing certain difficulties in this position, UTU seeks in the alternative partial summary judgment for switchmen in connection with the movement of light passenger engines. See 45 U.S.C. § 153 First and Second, § 153(q).

I find no basis of support for the claim that the freight engine claims depended on the fate of the claims related to movements of light passenger engines. The record contains some discussion to the effect that the former claims (dockets 1423 through 1319) were of the "cow bell" type, disposition of which is dependent upon what was decided in the prototype claims relating to light pas-senger engine movements. The Award does state that the parties stipulated at the hearing that those dockets would be governed by "Award No. 1 of this Board."

The whole business is a mystery. The record demonstrates a degree of confusion in respect to the scope of the submission that should not tolerate consideration by the Board of any other claims than "the gravamen of the dispute"— that is, the contractual entitlement of the switchmen to handle light passenger engines to and from the passenger station at Savannah.

## VI

■ Federal courts may not substitute their judgment for those of the Board Divisions of NRAB. "[T]he range of judicial review in enforcement cases is among the narrowest known to the law." Diamond v. Terminal Railway Alabama State Docks, 421 F.2d 228, 233 (5th Cir.). Awards are final in the absence of fraud or jurisdictional defects. Gunther v. San Diego and Arizona Eastern R. Co., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308; Diamond v. Terminal Railway Alabama State Docks, *supra*; Brotherhood of Railroad Trainmen v. Central of Georgia Railway Co., 415 F.2d 403 (5th Cir.), cert. den. 396 U.S. 1008. The Railway Labor Act specifically confers upon federal courts the duty of determining whether jurisdiction of a special board is exceeded. 45 U.S.C. § 153 First (p, q); Second; Baltimore and Annapolis Railroad Company v. National Mediation Board, D.C.Md., 321 F.Supp. 51, 56.

I could rule that the uncertainty and indefiniteness as to the nature of the claims amounted to a jurisdictional defect as to all except the ones connected with light passenger engine movements. This would place the case in the following posture: The Award would be sustained as to the passenger engine claims of the switchmen. The Special Board would separate them from claims involv-

---

4. It would make its final run on May 1, 1971.

ing freight engine movements. A new submission would be made as to the latter. The Board would consider them at a hearing after proper notice to the hostlers' representative and opportunity afforded to be heard as to the past liability to the switchmen as well as the Carrier's future obligations.

■ Such a fragmented handling is, however, most unsatisfactory. The Board, the switchmen, the hostlers and perhaps the Carrier seem to have assumed that a decision on the prototype claims would govern all the dockets. It is hard to conceive that the hostler craft would have declined to participate had it understood the implications of a ruling favorable to the switchmen. This all-pervading confusion made a final award impossible. The hostlers' disavowal of light passenger engine service does not satisfy *Union Pacific* where the effect of the Board's ruling was to decide their right to the freight engine work. Notice to that craft was essential to a final, binding award as to the entire dispute. So was consideration of all bargaining agreements between the crafts and Carrier. An affirmative award of the work must be made by the Board. See National Labor Relations Board v. Radio and Television Broadcast Engineers Union, et al., 364 U.S. 573, 579, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961); Local 416, Sheet Metal Workers International Association v. ABC Contractors, Inc., D.C.Wis., 335 F.Supp. 646, 649.

## VII

■ Was there a jurisdictional dispute between the crafts requiring notice to the hostlers and opportunity to participate at the hearing? Such a dispute exists where an "asserted overlapping of the interests of the two crafts" exists. Brotherhood of Locomotive Firemen and Enginemen v. Southern Pacific Company, 447 F.2d 1127, 1134 (5th Cir.).

After the Award was handed down R. E. Loomis, Central's Assistant Vice President of Labor Relations, requested the Board for an interpretation. He asked for clarification as to whether its jurisdiction was restricted to agreements between Carrier and SUNA in view of the fact that the submission spoke in terms of "yard agreements." Also, did the Board's jurisdiction include agreements with organizations such as the Brotherhood of Locomotive Firemen and Enginemen?[5] In these and other matters an interpretation was requested.

The discovery procedures of Central in the litigation before this Court turned up a good deal of post-Award correspondence among UTU officials in October–December, 1969. General Chairman Healan (hostlers) informed President Luna on November 4th of that year that he had discussed the case with General Chairman Moore (switchmen) and that "if it was his position that a hostler and helper could not handle switches anywhere in any yard then we were in disagreement." He also stated that should it be Mr. Moore's position that the Award applies to handling of light engines other than passenger engines at Savannah and that therefore "hostler and helper cannot handle switches for the movement . . . then we do have a jurisdictional dispute." In a letter to Mr. Luna dated December 5, 1969, Healan stated that Moore's letter to the President of November 7th indicates that such "is exactly what he is saying, i. e., hostlers and helpers cannot align switches and give signals for the movement of light engines."

Discovery by Central also turned up correspondence and records in connection with a dispute at Central's yard at Nixon, Georgia between two UTU crafts —trainmen and switchmen, in 1969–1970. President Luna decided that it was jurisdictional in nature. He took the position that the Chairman repre-

---

5. Apparently the BLF & E Schedule Agreement was not introduced by the Carrier at the original hearing. See comment in "Interpretation of Award No. 1," p. 3.

senting the trainmen had a right to appear before the PL Board. This appears to have greatly vexed General Chairman Moore. He wrote to Luna on August 19, 1970, complaining of what he termed "wishy-washy business" and characterized the guidelines as "most inconsistent" in the light of the President's prior handling of the Savannah claim. On August 20, 1970, Mr. Moore prophesied that the Carrier would inject the "inconsistencies into the trial of the case of Award 1 of Public Board 217." He ominously added, "Now I ask you does the United Transportation Union stand divided? Are we not one party? . . . [I]f we do not stand together . . . we are going to fail in the Courts in my opinion in the enforcement of that Award." See defendant's additional answers to plaintiff's interrogatories.

Identical affidavits were executed in February, 1971, by the respective General Chairmen of the affected crafts. They both stated that no jurisdictional dispute existed since the Award of PL Board No. 217 "addresses itself only to the handling of switches and giving of hand signals in the movement of light passenger engines to and from the passenger station at Savannah. . . ." However, the two Union officials were of the view that this did not relieve Central of its obligation as to claims involving light freight engines. Healan deposition, pp. 42–44; Moore deposition, p. 73. The two affidavits did not settle future work assignments at Savannah. Should hostlers move engines, "rest assured," said General Chairman Moore, "we are going to file claims." Deposition, pp. 74, 78. Mr. Healan said that similar action would be taken by the hostlers if Central used the Award of the Special Board to transfer hostlers' present work to switchmen. "Definitely

there would be a protest made." Deposition, p. 34.

The affidavits of the two General Chairmen boil down to Central paying switchmen for all past freight and yard movements without any commitment by the crafts as to its future liability and the future right of such crafts to the work. There seems to have been a tacit agreement between the General Chairmen that the Award would apply only to light passenger engines and would have no efficacy as to the freight engine claims. The deponents conceived the affidavits to be a "final binding judgment" as to the application of the Savannah award. Healan deposition, p. 34.

Such a disposition of the controversy does not comport with the requirement that a special board resolve disputes finally and in a manner binding upon all interested parties.

No matter how UTU or the affected crafts may try to wish the fact away, a dispute exists and persists. It may not have emerged in the open but the fire of the controversy was only banked. The dispute between the crafts cannot be dissipated on the theory of General Chairman Moore that there was none since there was no "issue regarding anybody else's contract except my own." Deposition, p. 26. His opinion was "founded upon the agreement itself, the fact that the work is by nature yardmen's duty and by the fact that [in the light of] history it was yardmen's duty and that the carrier abrogated it." Deposition, p. 31. Even if this contention is restricted to a passenger engine context, notice and participation by the hostler craft was essential under *Union Pacific*. A decision limited to the switching of light passenger engines could have important bearing upon the freight engine issue.[6]

The General Chairman of Enginemen (hostlers) was not aware of the nature

6. This is true irrespective of the fact that the Chairman and Neutral Member of Special Board No. 217 placed heavy emphasis in the Award on the 1948 Pilot position arrangement at Savannah and the circumstances and understandings un-

der which it was cancelled in 1956. The Pilot positions apparently affected only the movement of light passenger engines to and from shop yard and passenger shed. Central vigorously denied the correctness of this interpretation.

of the claims filed by the switchmen.[7] He seems to have conceived that all that was being disavowed was the right to perform light passenger engine work which no longer existed. Should that assumption be correct, Mr. Healan had no "argument with the Award." Letter to President Luna, November 4, 1969, attached to answers to plaintiff's interrogatories.

If the switchmen were entitled to such work, the precedential effect of an award in that respect operated to the detriment of the hostlers as to future right to the freight engine work. Literally interpreted, the Award in this case can mean that hostlers and helpers at Savannah are out of a job. A ruling by a special board awarding pay to members of a craft claiming the right to a piece of work ordinarily speaks for the future as well as the past. Compliance by Central with the findings of the Board could require it to replace hostlers and hostler-helpers with yard crews in moving light freight engines at Savannah. If the Carrier refuses to comply with the Award, it runs the risk of paying two groups of employees for the same work. Kirby v. Pennsylvania R. Co., *supra*, 188 F.2d at 798–799.

Such a dilemma is precisely what *Union Pacific* aims at. "We granted certiorari in order to settle doubts about whether the Adjustment Board must exercise its exclusive jurisdiction to settle disputes like this in a single proceeding with all disputant unions present . . . We hold that it must." 385 U.S. at 160, 87 S.Ct. at 371.

### VIII

The lack of notice to the hostler craft infected the Award at the start. No post-Award disclaimer as to the extent of the switchmen's claim nor unilateral action by the affected crafts can cure the malady. The Special Board "could not make a proper determination of the matter" unless it also reviewed the contracts of other unions "who may have an interest." In such cases the matter must be remanded to the special board for an opportunity to another interested union to be heard and for a review of other labor contracts and their effect on the award. See Transportation-Communication Employees Union v. St. Louis-San Francisco Railway Company, *supra*, 296 F.Supp. at 511.[8]

If Dr. Seidenberg had been aware of facts developed subsequent to the Award, the ruling as to the necessity of hostler participation may have been different. I refer to such subjects as the organizational status of UTU; President Luna's "finding" that there was no jurisdictional dispute; the underlying controversy between the two crafts over handling light freight engines, and the fact that the dispute has not been finally resolved within UTU.

I find that as a matter of law a dispute as to work rights existed between hostlers and switchmen; that Central adequately and timely made that point and did not waive a defense as to the necessity of notice to all parties involved. Here a right to perform a type of service, soon to be non-existent, was disavowed by a craft which has been paid for performing it in the past. A jurisdictional dispute nonetheless exists where a decision as to such claim may determine the right to perform a related type of service as to which each craft contractually lays claim.

Assurance by a union that there will be an internal settlement of a dispute between two member crafts is feckless where the controversy is not fully and finally resolved by the labor

---

7. "I know nothing about these dockets . . . I don't know what is involved in them." Deposition of General Chairman Healan (hostlers), p. 15.

8. The brief of UTU asserts that the decision remanding award of PL board is not distinguished for its "reasoning" and that such action was apparently taken without benefit of brief or argument. I gained the impression from reading the order that the case was carefully considered by District Judge Meredith.

organization. Here the claimed resolution of such dispute among the two crafts accomplished nothing more than prejudice to the economic interests of the Carrier without any disturbance of those of the crafts. Where the two crafts unilaterally agree on a settlement a board must nevertheless proceed to determine the dispute and afford the employer a chance to participate. See National Labor Relations Board v. Plasterers' Local Union No. 79, 404 U.S. 116, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971).

## IX

UTU's motion for full or, in the alternative, partial enforcement of the Award of October 2, 1969, is denied.

The Award is jurisdictionally defective and unenforceable in all respects, including the grant of pay by Special Board No. 217 to switchmen for claims for light passenger engine movements to and from the yard and passenger shed at Savannah. Central's motion for summary judgment is granted.

The case is remanded pursuant to 45 U.S.C. § 153 First (q) and § 153 Second for further action consistent with this Order and for a *de novo* hearing and binding disposition of all claims and all disputes between the two crafts and the Carrier.

A remand for further proceedings is not a final order appealable under 28 U.S.C. § 1291. United Transportation Union v. Illinois Central Railroad Company, 433 F.2d 566 (7th Cir.); Transportation-Communications Employees Union v. St. Louis-San Francisco Ry., *supra*, 419 F.2d 933; Pauls v. The Secretary of Air Force, 457 F.2d 294, 297–298 (1st Cir.). I will consider before remand suggestions as to more specific directions in respect to subsequent procedures in the case on the special board level. It may be that the remand should not be to Special Board No. 217 but to another and new PL Board.