La **SOCIETE ANONYME des PARFUMS LE GALION, Plaintiff-Appellant,**

v.

**JEAN PATOU, INC. and Michael Stramiello, Jr., Collector of Customs of the Port of New York, Defendant-Appellee.**

No. 530, Docket 72-2409.

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1974.

Decided April 9, 1974.

Arthur A. March, New York City, for plaintiff-appellant.

Alex Friedman, New York City (Martin J. Beran, David A. Weinstein, and Blum, Moscovitz, Friedman & Kaplan, New York City, of counsel), for defendant-appellee Jean Patou, Inc.

Before LUMBARD, FRIENDLY and TIMBERS, Circuit Judges.

FRIENDLY, Circuit Judge:

Plaintiff LeGalion, a French perfume manufacturer, has for years sold its perfume under the trademark "SNOB" in a number of foreign countries. The sales have been substantial, amounting in one recent five-year period to almost $2,000,000. LeGalion has been unable to sell SNOB in the United States, however, because in 1951 defendant Patou,[1] an American perfume manufacturer, obtained a trademark registration for SNOB in this country. Pursuant to § 42 of the Lanham Act, 15 U.S.C. § 1124,[2] Customs officials subsequently refused to permit LeGalion to import its

---

1. Plaintiff stipulated to the dismissal of the action as to defendant Stramiello, Collector of Customs at the Port of New York, prior to trial. The U. S. Attorney agreed that if the court should determine that plaintiff was the rightful owner of the SNOB trademark, Stramiello would do nothing to prevent the importation of plaintiff's perfumes.

2. This reads in relevant part:
> No article of imported merchandise . . . which shall copy or simulate a trade-mark registered in accordance with the provisions of this chapter . . . shall be admitted to entry at any customhouse of the United States.

A parallel provision in the Tariff Act of 1930, 19 U.S.C. § 1526(a), provides:
> It shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent Office . . . and if a copy of the certificate of registration of such trade-mark is filed with the Secretary of the Treasury . . . .

SNOB perfume because of the conflict with defendant's registered mark. In spite of the registration, Patou has never made a serious effort to merchandise SNOB; between 1950 and 1971, it sold only some 89 bottles of SNOB,[3] and it engaged in no advertising or other sales efforts on behalf of the product. Patou's sales of SNOB between 1951 and 1969 generated a "gross profit" of only about $100, on retail sales of less than $600.

In 1956, LeGalion filed suit in the District Court for the Southern District of New York, seeking declaratory relief that would permit it to import its SNOB brand and give it trademark rights in the name. LeGalion claimed that Patou had never used the SNOB trademark sufficiently to sustain its claim of ownership. After Patou filed its answer, however, plaintiff took no further steps to prosecute the case, and it was dismissed by Judge Herlands in 1958.

After a hiatus of some seven years, LeGalion brought a second action in the United States Patent Office in 1965 seeking cancellation of Patou's SNOB registration. Again LeGalion did nothing to bring the case to trial, and it was dismissed in 1967.

Continuing in its languorous course, plaintiff in 1966 filed another complaint in the District Court for the Southern District of New York, demanding essentially the same relief as the 1956 complaint. Specifically, LeGalion sought to force the Collector of Customs to permit the importation of its SNOB perfume and requested declaratory relief, damages, cancellation of Patou's SNOB registration, and "such other and further relief as to this Court may seem just." After more delay, the case finally came to trial in July, 1972. In a six-page memorandum decision, Judge Gagliardi held that although Patou's sales of SNOB were minimal, they were sufficient to maintain its trademark rights, and thus to block the importation of LeGalion's product. The court based its conclusion on three grounds. First, it found that the sales program was not a sham: each sale was profitable, and each was effected on order from a *bona fide* customer. On that basis the court distinguished Merry Hull & Co. v. Hi-Line Co., 243 F.Supp. 45 (S.D.N.Y. 1965), where the plaintiff's practice of distributing its product only to relatives, friends, and employees was held not to constitute a *bona fide* commercial use of the trademark. Second, it held that Patou's minimal use of its SNOB trademark was sufficient "in the light of the customary practice of perfumers to 'reserve' a name and to carry on trademark maintenance programs," 353 F.Supp. at 293. The court noted that the difficulty of finding new and attractive trade names for perfumes had caused manufacturers to hold a number of potential trade names in reserve until such time as the company might decide to begin large-scale distribution of the product under that name. Minimal *bona fide* use for the purpose of trademark protection, the court wrote, is all the law requires. Finally, the district court held that the pendency of legal proceedings since 1956 concerning the validity of Patou's SNOB mark constituted a valid defense to LeGalion's claim that Patou's use of the mark had been only token in nature. From the district court's judgment for defendants, 353 F.Supp. 293 (S.D.N.Y.1972), plaintiff brought this appeal.

## I.

At the outset we must consider the related problems of jurisdiction and mootness. In its complaint, LeGalion alleged jurisdiction under the

---

3. Defendant Patou urges that its sales were in fact somewhat greater—as much as 10 bottles per year! While this would make no significant difference, we accept the district court's finding that Patou "produced and sold in the United States in a very limited amount a perfume called SNOB . . . with total sales from 1951 to 1969 of 72 bottles . . . . Seventeen bottles were sold to retail stores between 1969 and 1971." 353 F.Supp. at 292.

Lanham Act and on the basis of diversity of citizenship. However, Patou's registration for SNOB expired on January 2, 1971, and its counsel stipulated at trial that the registration had not been renewed. The demand for cancellation of the defendant's 1951 registration is therefore moot. Since the Lanham Act section that bars importation of a product bearing a conflicting trademark applies only if the established mark is registered, the claim for injunctive relief would also appear moot. With those two major claims out of the case, plaintiff has shifted its ground somewhat: on appeal, it has requested that the court grant a declaratory judgment that Patou has no rights to the SNOB trademark.[4] That request falls fairly within the scope of the catch-all paragraph in its complaint, but it does not arise under the Lanham Act if Patou's only remaining trademark claim stems from common

law rights.[5] The last possible basis for federal question jurisdiction is plaintiff's request for "an accounting of all damages caused by the defendant Jean Patou, Inc. in preventing the importation . . . of plaintiff's perfumes." The Lanham Act contains no specific provision for recovery of damages in this context. However, § 38 of the Act, which provides a damages remedy for injuries suffered in consequence of a false or fraudulent registration, might be read to extend to plaintiff's claim,[6] cf. Landstrom v. Thorpe, 189 F.2d 46 (8 Cir.), cert. denied, 342 U.S. 819, 72 S.Ct. 37, 96 L.Ed. 620 (1951); D. M. & Antique Import Corp. v. Royal Saxe Corp., 311 F.Supp. 1261, 1272 (S.D.N.Y.1970). While it appears that the damages claim is at least sufficient to afford a ground for federal jurisdiction, it may not be necessary to reach that issue, since diversity of citizenship appears to provide

4. Plaintiff has not pressed on appeal the claim in its complaint that it should be declared the owner of the SNOB trademark. It is well settled that foreign use is ineffectual to create trademark rights in the United States, Calimafde, Trademarks and Unfair Competition, § 4.10 (1970).

5. This court has long held that the Lanham Act does not provide jurisdiction or a substantive remedy for general common law unfair competition claims, American Automobile Ass'n, Inc. v. Spiegel, 205 F.2d 771 (2 Cir. 1953), cert. denied, 346 U.S. 887, 74 S. Ct. 138, 98 L.Ed. 391 (1953); Vanity Fair Mills, Inc. v. T. Eaton Co., Ltd., 234 F.2d 633 (2 Cir. 1956), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). The Eighth and Ninth Circuits have read § 44 of the Act, 15 U.S.C. § 1126, very broadly, interpreting it as providing a federal remedy, and through § 39, 15 U.S.C. § 1121, federal jurisdiction in any unfair competition suit, Stauffer v. Exley, 184 F.2d 962 (9 Cir. 1950); Pagliero v. Wallace China Co., 198 F.2d 339 (9 Cir. 1952); Iowa Farmers Union v. Farmers' Educ. & Coop. Union, 247 F.2d 809 (8 Cir. 1957). The majority of the circuits have followed this circuit's view, Allen v. Barr, 196 F.2d 159, 161 (6 Cir. 1952); L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649 (3 Cir. 1954); Royal Lace Paper Works, Inc. v. Pest-Guard Prods., Inc., 240 F.2d 814 (5 Cir. 1957); see Developments in the Law—Trade-Marks and Un-

fair Competition, 68 Harv.L.Rev. 814, 878–81 (1955).

Where the Lanham Act is not the source of the right sued upon, state law applies. Artype, Inc. v. Zappulla, 228 F.2d 695 (2 Cir. 1956); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 540–541 n. 1 (2 Cir. 1956). In this case, however, the choice of law presents no real problems, since trademark use is accepted as a general common law requirement, with no discernible modulations from jurisdiction to jurisdiction. Federal registration similarly does not alter the basic common law requirement of use. The Lanham Act does not create the trademark right; it only recognizes the right acquired through use, Radio Shack Corp. v. Radio Shack, Inc., 180 F.2d 200 (7 Cir. 1950); Vandenburgh, Trademark Law & Procedure § 2.10 (2d ed. 1968).

6. In its pretrial memorandum plaintiff attempted to bring its damages claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), on the ground that defendant had "falsely represented that it is possessed of the right to prevent the importation into the United States of the plaintiff's perfumes." That effort seems wide of the mark. Section 43(a) is intended to reach false advertising violations, not false registration claims. L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., supra, 214 F.2d 649; Alum-A-Fold Shutter Corp. v. Folding Shutter Corp., 441 F.2d 556, 557 (5 Cir. 1971).

a sufficient jurisdictional basis.[7] It seems highly likely that plaintiff will be able to sustain its allegation that there is more than $10,000 in controversy; if this should be challenged, the district court on remand should determine this and make whatever other factual inquiries may be necessary to resolve any remaining doubts on the question of jurisdiction.[8]

## II.

Beyond the jurisdictional question, this case presents several difficult questions concerning trademark law and the principles of res judicata. The difficulties relating to trademark law stem from the tension between providing relative security to a business in maintaining its trademarks and preventing a business with only a nominal claim to a valuable trademark from barring its use by a party with a substantial financial stake in using the mark.

Under familiar trademark principles, the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially, Trade-Mark Cases, 100 U.S. 82, 94, 25 L.Ed. 550 (1879); United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); Kohler Manufacturing Co. v. Beeshore, 59 F. 572, 576 (3 Cir. 1893); Worden v. Cannaliato, 52 App.D.C. 254, 285 F. 988, 990 (1924); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5 Cir.

1963); Restatement (Second) of Torts § 719, comment b (tent.draft 1963). The Supreme Court wrote in the *United Drug Co.* case, 248 U.S. at 97, 39 S.Ct. at 50:

There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trademarks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

Adoption and a single use of the mark may be sufficient to entitle the user to register the mark, see Maternally Yours, Inc. v. Your Maternity Shop, Inc., *supra*, 234 F.2d 538; Montgomery Ward & Co. v. Sears, Roebuck & Co., 49 F.2d 842, 18 CCPA 1386 (1931); Fort Howard Paper Co. v. Kimberly-Clark Corp., 390 F.2d 1015, 1017, 55 CCPA 947, cert. denied, 393 U.S. 831, 89 S.Ct. 99, 21 L.Ed.2d 101 (1968); Community of Roquefort v. Santo, 443 F.2d 1196, 58 CCPA 1303 (1971). But more is required to sustain the mark against a charge of nonusage. Xtra, Inc. v. Warren Petroleum Corp., 175 U. S.P.Q. 660 (Trademark Trial & App. Bd. 1972); Arnold, A Philosophy on the Protections Afforded by the Patent, Trademark, Copyright and Unfair Competition Law, 54 Trademark Rep. 413, 431 (1964); Kegan, Trademark "Use" —Fact or Fiction, 55 Trademark Rep. 175 (1965). To prove bona fide usage,

---

7. If, for some reason not now apparent, diversity of citizenship should prove unavailable as a jurisdictional basis, the district court would have to consider whether to exercise pendent jurisdiction over the common law claims on the basis of the damages claim.

8. Plaintiff stated in its pretrial memorandum that Patou had reapplied for the SNOB reg-

istration through its parent corporation. As of late 1972, according to plaintiff, the application was still pending. If the registration has since been granted, the district court should consider permitting LeGalion to amend its complaint to include a claim based on the new registration, in order to facilitate disposing of this case as efficiently as possible.

the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory, 3 Callmann, Unfair Competition, Trademarks & Monopolies § 76.2(d) (1969).

Plaintiff claims that the minimal use in this case was not sufficient to constitute the bona fide use of the trademark necessary to confer rights upon Patou, particularly since by obtaining its registration Patou succeeded in completely excluding LeGalion's established product from the American market. Defendant in turn relies essentially on the three grounds adopted by the district court: that the 89 sales were all profitable, arms-length transactions; that the practice of reserving trademarks through trademark maintenance programs provided a legitimate excuse for Patou's minimal use; and that the pendency of legal proceedings independently justified its failure to exploit the mark energetically.

■ None of these grounds is persuasive. While the district court termed the 89 sales in 20 years "bona-fide," we cannot agree that such a meager trickle of business constituted the kind of bona fide use intended to afford a basis for trademark protection. The court found that the sales were profitable in that they produced a total "gross profit" of $100 over the twenty-year period. However, it is inconceivable that Patou could actually have experienced anything but a substantial per unit loss in bottling, labeling, handling, and shipping its SNOB perfume at the rate of one and two bottles per order. Simply maintaining accurate records of the sales of SNOB would easily have eaten up the $100 "gross profit" over the twenty-year period. Even if it should happen that by some touch of managerial or accounting wizardry Patou has managed to turn a net profit of a few dollars on its sales of SNOB, its use of the trademark would still not constitute good faith commercial exploitation. It is true, as defendant contends, that trademark rights have often been upheld in spite of modest sales programs, see, e. g., Kathreiner's Malzgaffee Fabriken v. Pastor Kneipp Medicine Co., 82 F. 321 (7 Cir. 1897); Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F.2d 114, 123 (5 Cir. 1973); In re Beatrice Foods Co., 166 U.S.P.Q. 431 (C.C.P.A.1970); E. I. duPont de Nemours v. Big Bear Stores, Inc., 161 U.S.P.Q. 50 (Trademark Bd. 1969); Adam Hat Stores, Inc. v. Lefco, 44 F.Supp. 442 (E.D.Pa.1942); aff'd, 134 F.2d 101 (3 Cir. 1943); California Spray-Chemical Corp. v. Ansbacher Siegle Corp., 55 U.S.P.Q. 298 (Comm'r of Patents 1942). In those cases, however, the trademark usage, although limited, was part of an ongoing program to exploit the mark commercially. In numerous other cases, where no present intent has been found to market the trademarked product, minimal sales have been held insufficient to establish trademark rights. See, e.g., LeBlume Import Co. v. Coty, 293 F. 344, 351 (2 Cir. 1923) (occasional sales so infrequent that "it cannot be said that the producer of the goods had obtained a market for them here which entitled his trade-mark to protection"); Philip Morris, Inc. v. Imperial Tobacco Co., 251 F.Supp. 362 (E. D.Va.1965), aff'd, 401 F.2d 179 (4 Cir. 1968), cert. denied, 393 U.S. 1094, 89 S. Ct. 875, 21 L.Ed.2d 784 (1969) (shipments sporadic, casual and nominal in character); D. M. & Antique Import Corp. v. Royal Saxe Corp., supra (use "transitory and minimal"); Vapon, Inc. v. Dreyfuss, 110 U.S.P.Q. 142 (Comm'r of Patents 1956) (sales "sporadic and inconsequential;" no real market for the product developed); United Plywoods Corp. v. Congoleum-Nairn, Inc., 121 U.S.P.Q. 102 (Trademark Trial & App.Bd. 1959) (no regular marketing of the product); Revell, Inc. v. Kadee Co., 162 U.S.P.Q. 176 (Trademark Trial & App. Bd. 1969) (minimal sales and no intent to use the mark commercially). It is clear to us that Patou has never put its product on the market in any meaningful way; indeed, it has given no indica-

tion that it has any current plans to do so.[9]

The district court recognized, as Patou virtually concedes, that Patou's real purpose in making its meagre sales of SNOB was to establish and maintain rights in the SNOB trademark. Patou representatives testified that the company maintained the program in order to preserve the option of someday producing SNOB in large volume. In fact, it seems much more likely that Patou regarded the program as a relatively painless way to keep a potential competitor at bay. The disincentives to develop its own perfume under the SNOB label were strong—it would not be able to expand into many foreign markets, and the likely confusion between it and its foreign competitor might work to its disadvantage. In any event, we disagree with the district court's conclusion that because of the custom in the perfume industry of "reserving" trade names and "carrying on trademark maintenance programs," Patou's conduct was sufficient to establish rights to the SNOB mark. The token sales program engaged in here is by its very nature inconsistent with a present plan of commercial exploitation.[10]

The relatively few courts that have treated the question have uniformly manifested reluctance to consider usage sufficient when it is obviously contrived solely for trademark maintenance purposes. In Phillips v. Hudnut, 49 App. D.C. 247, 263 F. 643, 644 (1920), the court held, in circumstances somewhat more extreme than those in this case, that a company must do more than simply distribute its product in an effort to lay the basis for registration; it must actually put the product on the market

before trademark rights will attach. Similarly, in Mendes v. New England Duplicating Co., 94 F.Supp. 558, 560 (D.Mass.1950), aff'd, 190 F.2d 415 (1 Cir. 1951), the court noted that if a particular shipment was made merely in "token conformity with the statute in order to bolster his claim for the trademark registration," the plaintiff could acquire no rights in the mark. Where plaintiffs had distributed several editions of a newsletter solely for the purpose of securing trademark rights in the name, a New York court wrote:

> Plaintiffs acquired no rights from the publication of the newsletter. This was not a commercial user; it was purely pro forma, for the sole purpose of acquiring rights by aping the means by which such rights are acquired. Such pretense is not an acceptable substitute for bona fide use.

O'Connor & Gordon, Inc. v. Handicraft Publications, 206 Misc. 1087, 136 N.Y.S. 2d 558, 560 (Sup.Ct.1954). See also Mister Donut of America, Inc. v. Mr. Donut, Inc., 153 U.S.P.Q. 773 (C.D.Cal. 1967), aff'd, 418 F.2d 838 (9 Cir. 1969); Hans Holterbosch, Inc. v. Rheingauer Schaumweinfabrik Schierstein, 110 U.S. P.Q. 543, 545 (Comm'r of Patents 1956); Academy of Motion Picture Arts and Sciences v. Academy Awards, Inc., 89 U.S.P.Q. 451, 460–61 (Patent Office Examiner-in-chief 1957) ("the purported use of the trademark on goods in trade can only be characterized as a mere pretense and subterfuge, carried out for the sole purpose of laying a basis for securing the trademark registration").

The case of Clairol, Inc. v. Holland Hall Products, Inc., 165 U.S.P.Q. 214 (Trademark Trial & App.Bd.1970), re-

---

9. Appellee's related argument that it has not legally abandoned the SNOB trademark does not merit much attention. The issue of abandonment arises only if the defendant has previously acquired rights in the trademark. Essentially plaintiff's challenge here is that Patou has never established any enforceable rights in the SNOB mark and thus has nothing to abandon.

10. The cases excusing limited use for legitimate business reasons provide no aid to appellee. A trademark maintenance program obviously cannot in itself justify a minimal sales effort, or the requirement of good faith commercial use would be read out of trademark law altogether.

cites the same principles in a factual setting somewhat similar to the one in this case. Clairol was engaged in a trademark maintenance program on behalf of its product, "Wipeout." The Board found that Clairol's token monthly shipments of its product to three retail druggists "can be categorized more or less as a defensive or negative approach serving merely to maintain rights therein without ever attempting to establish a trade in [the product]. Trademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade. Absent these elements, no trademark can be created or exist . . . . Registrable rights manifestly cannot flow from these activities and the old adage 'no trade—no trademark' is applicable here." Cf. Van Camp Sea Food Co. v. Universal Trading Co., 138 U.S.P.Q. 323, 324–25 (Trademark Trial & App.Bd. 1963); Sun-Maid Raisin Growers v. Sunaid Food Products, Inc., 254 F.Supp. 649 (S.D.Fla.1964). The twenty-year period of inaction by defendant persuades us that any use it made of the SNOB mark was purely defensive, and thus insufficient to obtain enforceable rights in the mark.[11]

▮▮▮▮▮ Finally, appellee seeks to defend its limited use on the ground that the pendency of legal proceedings, and the "continued threat of litigation" between its adoption of the mark and the present have discouraged it from attempting to exploit the mark more fully. While there are circumstances under which nonuse or limited use of the mark would be justified by legal challenges, they are clearly not present here. LeGalion has been litigating in one forum or another for about half the twenty-three years since Patou adopted the SNOB mark, but in the remaining periods Patou's behavior has been no more aggressive than while suits have been pending. Its argument that it has constantly feared LeGalion might rekindle the dispute plainly cuts too broadly. A party with a shaky claim cannot justify a course of minimal usage by arguing that its very conduct might someday draw litigation. Patou cites Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794 (9 Cir. 1970), in support of its claim that ongoing litigation over trademark rights can justify limited usage. In that case, however, the issue was one of abandonment. Moreover, it could have been disastrous for defendant in that case to have begun an extensive merchandising campaign while the ownership of its trademark was still in litigation. Here, by contrast, any additional sales activity, particularly during the period that no suits were pending, would actually have strengthened Patou's hand. Without suggesting that the "lawsuit" justification may not be available in a more fitting case, we do not accept the district court's conclusion that plaintiff's desultory course of litigation had frozen defendant Patou into a state of artificial inactivity.

### III.

If there were no more to this case than the district court's finding that defendant owned the trademark rights to SNOB and thus had legitimately procured the bar against LeGalion's product, we would simply reverse and remand for consideration of the proper remedies. However, the dismissal of

---

11. Determining what constitutes sufficient use for trademark ownership purposes is obviously a case-by-case task. Lest our opinion be taken as cutting more broadly than we intend, it is important to note expressly that the balance of the equities plays an important role in deciding whether defendant's use is sufficient to warrant trademark protection, cf. Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531, 534–535 (2 Cir. 1964). The fact that defendant's conduct has barred a foreign competitor from marketing a well-established product in this country, without promoting any compensating public interest, requires close scrutiny of the propriety of defendant's "use."

plaintiff's prior suit on essentially the same claims raises a serious res judicata problem.

Under F.R.Civ.P. 41(b), a dismissal for failure to prosecute an action "operates as an adjudication upon the merits," unless the court specifies otherwise. In his 1958 order dismissing the first case brought by the plaintiff on this cause of action, Judge Herlands gave no indication that the dismissal should be without prejudice, and under normal circumstances we would have no alternative to holding that such a dismissal would have res judicata effect, *see* Costello v. United States, 365 U.S. 265, 286, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); A. B. Dick Co. v. Marr, 197 F. 2d 498, 502 (2 Cir.), cert. denied, 344 U.S. 878, 73 S.Ct. 169, 97 L.Ed. 680 (1952); Nasser v. Isthmian Lines, 331 F.2d 124, 127–128 (2 Cir. 1964); Freedman v. American Export Isbrandtsen Lines, Inc., 451 F.2d 157 (3 Cir. 1971), cert. denied, 405 U.S. 992, 92 S.Ct. 1264, 31 L.Ed.2d 460 (1972). This would be so whether the suit were treated as being based on diversity of citizenship or federal question jurisdiction, Kern v. Hettinger, 303 F.2d 333, 340 (2 Cir. 1962); Penn v. Rinaldi, 323 F.2d 913 (2 Cir. 1963). Applying Rule 41(b) in this case presents several special problems, however. First, the district judge appeared at trial to be under the impression that Judge Herlands' dismissal had been without prejudice. Counsel for plaintiff so asserted, and defense counsel did not contradict him. Since these facts suggest there may be evidence outside the face of the order plainly indicating that Judge Herlands intended the dismissal to be without prejudice, the district court should explore this question on remand.[12]

A second problem is that plaintiff's cause of action is based not on an isolated act by defendant, but rather on a continuing course of conduct, or more precisely, nonconduct, starting before the first dismissal and continuing up to the present. Applying res judicata to claims involving continuing conduct over a long period of time presents difficulties at best. See Food Center, Inc. v. Food Fair Stores, Inc., 356 F.2d 775, 779–780 (1 Cir. 1966); Restatement (Second) of Judgments § 61.2(e) (Tent.Dr.No. 1, 1973). Here these difficulties are doubly vexing, first because the absence of an actual prior adjudication has deprived the court of the more precise tool of issue preclusion, and second because the central element in both cases was a request for declaratory relief. In effect, holding that the 1958 dismissal was with prejudice means that the 1955 request for a declaratory judgment must be treated as having been denied. There is understandably some reluctance to give broad effect to res judicata principles in that context, see Restatement (Second) of Judgments § 76, comments *c, e;* Vestal, Res Judicata/Preclusion, v–410–11 (1969); Developments in the Law—Res Judicata,

12. Judge Herlands' dismissal order made reference to a prior order setting out the conditions of the dismissal. If that earlier order provided that the dismissal would be without prejudice, then that effect should be given to the dismissal. In addition, the district court should not hold the dismissal to be an adjudication on the merits if the local rule under which Judge Herlands dismissed the action provided otherwise. United States v. Thomson, 114 F.Supp. 874 (S.D. N.Y.1953); Burns Mortgage Co. v. Stoudt, 2 F.R.D. 219 (E.D.Pa.1942); *contra,* King v. Mordowanec, 46 F.R.D. 474 (D.R.I.1969). While the current version of the local rule dealing with dismissals for want of prosecution is silent on the question, General Rule 23(a), Southern District of New York, several districts have provided that such dismissals should be without prejudice, see Note, Involuntary Dismissal for Disobedience or Delay: The Plaintiff's Plight, 34 U.Chi.L. Rev. 922, 925 n. 26 (1967). Although Rule 41(b) was designed in part to avoid the need to search the record in every case for evidence of the judge's intention, see Weissinger v. United States, 423 F.2d 795, 798 (5 Cir. 1970) (*en banc*), it would be unduly harsh to hold that the dismissal here was with prejudice without giving the district court an opportunity to evaluate the very real possibility that Judge Herlands intended otherwise.

65 Harv.L.Rev. 818, 881–82 (1952). In this case, even though there was no actual finding in the first suit that Patou's conduct was consistent with trademark ownership, a rigid application of res judicata would confer permanent protection on Patou's trademark maintenance program. On the other hand, to immunize this class of cases altogether from the operation of res judicata would permit plaintiffs to bring any number of harassing suits, each of which could be dropped prior to judgment. Since the doctrine is intended to serve the aims of fairness and efficient judicial administration, it need not be applied mechanically where those ends would not be served. As we have noted on several occasions, res judicata principles, if applied inflexibly, can at times result in unwarranted hardship. International Railways of Central America v. United Fruit Co., 373 F.2d 408, 419 (2 Cir.), cert. denied, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967), quoting 1B Moore, Federal Practice ¶0.410[2], at 1169 (2d ed. 1965); Desrosiers v. American Cyanamid Co., 377 F.2d 864, 871 (2 Cir. 1967). See also Spilker v. Hankin, 88 U.S.App.D.C. 206, 188 F.2d 35, 39 (1951); Cleary, Res Judicata Reexamined, 57 Yale L.J. 339, 349–50 (1948); 1B Moore, Federal Practice ¶¶ 0.405 [11], [12]. This may be a case in which a rigid application of res judicata is not warranted, even though it falls within the technical reach of the doctrine. On remand, the district court should consider any changes in Patou's conduct between the two suits, see Restatement (Second) of Judgments § 61, comment f, any actual prejudice that Patou might have suffered because of the delay in adjudication of the issue in this case, the effect, if any, of the expiration of Patou's registration, and the public interest considerations weighing in favor of or against the application of res judicata.

If, after resolving the various factual questions relating to jurisdiction and res judicata, the court determines that Le-Galion can maintain this action, it should consider what relief should be ordered in light of plaintiff's requests and the status of Patou's new application for registration. We reverse and remand for further proceedings in accordance with this opinion.