**DE BEERS LV TRADEMARK
LIMITED and De Beers LV
Limited, Plaintiff,**

v.

**DeBEERS DIAMOND SYNDICATE
INC. and Marvin Rosenblatt,
Defendants.**

No. 04 CIV.4099(DLC).

United States District Court,
S.D. New York.

June 9, 2006.

Barbara A. Solomon, David A. Donahue, Laura Popp–Rosenberg, Fross Zelnick

Lehrman & Zissu, P.C., New York City, for Plaintiffs.

Andrew D. Manitsky, Megan J. Shafritz, Gravel and Shea, Burlington, VT, for Defendants.

## OPINION

COTE, District Judge.

This case involves a dispute over the rights to use the name DE BEERS in connection with gemstones, jewelry, and other luxury goods in the United States market. DE BEERS, of course, is one of the most famous brands in the world and—in the minds of American consumers, who were exposed to the "A Diamond Is Forever" advertising campaign featuring the name DE BEERS—is inextricably linked to diamonds. Oddly, however, the entities that made DE BEERS so famous are not parties to this litigation. Indeed, for reasons discussed below, very little evidence has been submitted regarding who these entities are and what role they play in the diamond trade.

De Beers LV Limited ("DBLV") and De Beers LV Trademark Limited ("DBLV TM"), the plaintiffs in this matter, are two British companies that claim to have received rights from the De Beers Group ("DBG")—which apparently is a consortium of companies that includes De Beers Consolidated Mines Limited ("Consolidated") of South Africa and De Beers Centenary AG ("Centenary") of Switzerland—to exploit the DE BEERS mark in the United States. One of the plaintiffs has registered DE BEERS with the United States Patent and Trademark Office ("PTO") in connection with luxury retail store services. Plaintiffs have opened two such stores in America which, at present, sell diamond jewelry and watches under the DE BEERS name. More such stores are on the way.

These companies have sued Marvin Rosenblatt ("Rosenblatt") and his company DeBeers Diamond Syndicate Inc. ("Syndicate") under the Lanham Act and New York law for infringement both of the registered mark and of what they assert is the famous mark DE BEERS. The defendants have applied to register DeBeers Diamond Syndicate as a trademark in order to sell diamonds under that name over the Internet, where they have paved the way by registering dozens of domain names with the name DeBeers. Following a bench trial conducted on May 30–31, 2006, this Opinion presents the Court's findings of fact and concludes that the defendants' activities will create confusion with plaintiffs' registered mark DE BEERS. The plaintiffs have not shown, however, that they are entitled to relief under the famous marks doctrine.

*Procedural History*

Plaintiffs filed this action on June 1, 2004, alleging trademark infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition under New York common law; and trademark dilution in violation of New York General Business Law § 360–*l*. In their answer, defendants raised the affirmative defenses of failure to join necessary parties, unclean hands, priority of use of the mark, and lack of standing. Defendants moved to join Consolidated, Centenary, and De Beers Trademarks Ltd. ("Trademarks") as counterclaim defendants. They alleged Sherman Antitrust Act violations and requested a declaratory judgment against plaintiffs and the counterclaim defendants. Plaintiffs moved to strike defendants' affirmative defenses of unclean hands and lack of standing. They also moved to dismiss the counterclaims. In an Opinion of May 18, 2005, the motion to dismiss the declaratory judgment counterclaim was denied; the motion to dismiss the Sherman Antitrust Act counterclaim was granted; the motion for joinder was denied; the motion to strike the affirmative defense of unclean hands was granted; and the motion to strike the affirmative defense of lack of standing was denied. *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.,* No. 04 Civ. 4099(DLC), 2005 WL 1164073 (S.D.N.Y. May 18, 2005). Plaintiffs filed an amended complaint on December 30, 2005, adding a claim for violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, based on DBLV TM's ownership of a registered mark in DE BEERS for use in "retail store services featuring luxury consumer products."

*Trial Procedure*

The trial was conducted without objection in accordance with the Court's customary practices for the conduct of non-jury proceedings. The parties filed a Joint Pretrial Order and proposed findings of fact and conclusions of law on March 15. The parties also served affidavits containing the direct testimony of most of their witnesses, as well as copies of all the exhibits and deposition testimony which they intended to offer as evidence in chief at trial.

With its Pretrial Order submissions, plaintiffs presented declarations constituting the direct testimony of Pierre Mallevays ("Mallevays"), former director of acquisitions for LVMH–Moët Hennessy Louis Vuitton ("LVMH") and its chief negotiator during the creation of plaintiffs through a venture with DBG; Guy Leymarie ("Leymarie"), chief executive officer of DBLV; Amanda Fogg ("Fogg"), legal counsel and secretary for DBLV and DBLV TM; Alyce Alston, chief executive officer of DBLV US, Inc., a wholly owned subsidiary of plaintiff DBLV; Lynn Diamond ("Diamond"), executive director of the Diamond Promotion Service, a unit of J. Walter Thompson U.S.A., Inc. ("JWT"), an advertising firm; Joan Parker ("Par-

ker"), consultant to DBLV; Benedict Bird, a partner in the law firm Linklaters; Stuart Jennison ("Jennison"), a legal assistant at the law firm Jennison & Schultz, P.C.; Merida Lopez ("Lopez"), Mario Ortiz ("Ortiz"), and David Vanegas ("Vanegas"), paralegals at the law firm Fross Zelnick Lehrman & Zissu, P.C.; and Philip Johnson ("Johnson"), chief executive officer of Leo J. Shapiro Associates, Inc., a market research and consulting firm. With the exceptions of Jennison, Ortiz, and Vanegas, who defendants chose not to cross-examine, and Bird, whose testimony was rendered irrelevant by a ruling before trial, each of these witnesses appeared at trial and was cross-examined.

Defendants offered the testimony of defendant Rosenblatt; and Thomas Scheer ("Scheer"), a friend of Rosenblatt and an owner of Jarai & Scheer, a diamond dealer. Both witnesses appeared at trial and were cross-examined. Defendants also subpoenaed Caroline Amand ("Amand"), client director for Landor Associates, a branding firm. Amand testified at trial and was cross-examined.

Excerpts from the deposition testimony of the following individuals were offered and received into evidence at trial. Plaintiffs offered excerpts from the depositions of Caryl Capeci–Cossart ("Capeci–Cossart"), former employee of advertising agencies JWT and N.W. Ayer ("Ayer"); Christine M. Herring, a budget and accounts executive at the Diamond Trading Company, the sales and marketing arm of DBG; Carl Marcus ("Marcus"), chairman and founder of Capetown Diamond Corp.; and Rosenblatt. Defendants offered excerpts from the depositions of Stephen C.

Butcher ("Butcher"), president of website design company VickeryHill.com; Capesci–Cossart; Leymarie; and Fogg.

## FINDINGS OF FACT

The following constitutes many of the Court's findings of fact. Additional fact finding appears during the presentation of the Conclusions of Law.

*Plaintiffs*

Plaintiffs DBLV and DBLV TM were formed as limited companies under the laws of the United Kingdom on November 30, 2000. DBLV is owned in equal parts by an affiliate of DBG[1] and by a subsidiary of luxury goods purveyor LVMH.[2] DBLV TM is wholly owned by DBLV.

Pursuant to the joint shareholder agreement signed by DBG and LVMH on January 16, 2001, DBLV was created to engage in the "production and marketing of diamond jewellery and associated products under the De Beers brand name." These "associated products" were to include "goods usually sold by luxury goods retailers." In the shareholder agreement, DBG agreed that neither it nor its affiliated companies would compete with DBLV in the manufacture or sale of diamond jewelry or other luxury goods to consumers.

DBG and LVMH are equal shareholders in DBLV, and each appoints half of its directors. The company is run and managed by officers who are independent of DBG, LVMH, and their affiliates. DBG and LVMH are entitled to share in the revenue stream of DBLV. They have committed to make equal financial contributions to the company, but since DBG also

1. The DBG affiliate is identified in the transaction documents as "Riverbank Investments Limited." Mallevays testified that it is owned by "various companies within the De Beers Group of companies."

2. LVMH is a leading luxury goods company, with approximately 50 brands under its control, including Dom Perignon champagne, Christian Dior perfumes, Tag Heuer and Chaumet watches and jewelry, and Luis Vuitton and Givenchy fashion and leather goods.

contributed the rights in the DE BEERS mark described below, it is entitled to a greater share of the profits in excess of a set amount until another designated amount of profits is achieved, at which point they again split the profits equally.

*The Transfer of Rights in DE BEERS*

Plaintiffs trace their claim to the DE BEERS name to DBG members Consolidated and Centenary. On January 12, 2001, Consolidated and Centenary assigned the rights in DE BEERS worldwide (except in Southern Africa) to De Beers Intangibles Limited ("Intangibles"), which is also a part of DBG. On January 15—the day before the shareholder agreement was executed—Intangibles assigned all of its rights to use DE BEERS in the United States to its wholly owned subsidiary Trademarks. The agreement stated that Trademarks would hold the rights "subject to any license granted to third parties."

The parties intended that Intangibles and DBLV would enter into a global brand license agreement (the "GBL") that would provide DBLV with the right to exploit the DE BEERS name in connection with gemstones and jewelry, among other products, throughout the world (except in Southern Africa). A draft of the GBL was attached to the shareholder agreement. Because DBG had already registered its mark in most parts of the world, there was no need also to assign the rights necessary to apply for trademark registration in most jurisdictions. Since, as explained below, DBG does not operate in the United States, it had not obtained any trademark registra-

tions in the name DE BEERS in this country, and it was necessary to assign DBLV TM intellectual property rights so that that entity could apply for registration. DBG did not wish to assign those rights in connection with either gemstones or jewelry, however, explaining to its joint venture partner that these rights were just too close to its core business. Therefore, to prepare for the registration applications in the United States, on January 16, Trademarks signed an agreement assigning to DBLV TM [3] all rights to use the DE BEERS mark within the United States except in connection with gemstones and jewelry (the "Assignment").[4]

The GBL was not signed until approximately six months later, on July 27, 2001. According to its terms, Intangibles granted DBLV a license to use DE BEERS worldwide (except in Southern Africa) in connection with jewelry, watches, writing instruments, leather goods, perfumes, cosmetics, glassware, cutlery, clothing, footware, and certain other specified products. The GBL stated that Intangibles' "primary purpose" in licensing the rights was "to build the DE BEERS brand for diamonds and diamond jewellery." As part of the GBL, Intangibles warranted that "neither it nor any of its Affiliates own rights in the [DE BEERS] Trade Marks or any goodwill attaching thereto ... which are not being licensed under this Agreement." These documents, which should be read together as part of an integrated transaction among related entities, conveyed to plaintiffs any rights Intangibles possessed

---

3. DBLV TM was then known as Rapids Trade Mark Limited, and DBLV as Rapids World Limited.

4. The Assignment explicitly referenced the GBL, noting that Intangibles and DBLV had "agreed to enter into a license agreement ... pursuant to which [DBLV] will be granted certain licenses with respect to the 'DE

BEERS' mark for territories outside Southern Africa." DBLV also recognized Trademarks' "continuing ownership of the Trade Marks for gemstones and jewellery" and agreed not to take any "action [or] any positive steps to obtain or exercise ownership over such rights or the goodwill associated therewith, other than as may be authorized under the Global Brand License."

to exploit the DE BEERS mark in connection with luxury goods, including gemstones and jewelry.

The creation of this enterprise was widely reported. A page-one story in the Business Section of *New York Times* on January 17, 2001, trumpeted,

> De Beers, the South African diamond mining powerhouse that has made its name an international emblem of elegance and extravagance, and LVMH–Moet Hennessy Louis Vuitton, the French luxury retailer that has harnessed the brand power of some of the world's finest goods, are joining forces.... [T]hey were creating a new company that would open stores in the world's most fashionable cities to sell diamond jewelry branded with the De Beers name already so widely associated with the precious stones. [5]

Two days earlier, the *International Herald Tribune* had also run a lengthy article about the partnership of these two giants and their intention "to set up De Beers stores across the world that would make the ... company the Dior of the diamond business."

In September 2002, Intangibles transferred to DBLV the ownership of various Internet domain names, including debeers.com, debeers.biz, and debeersdiamonds.com. In 2005, these sites cumulatively received an average of 8.6 million hits each month, with approximately 60% coming from within the United States.

*Registration of the DE BEERS Mark*

Under the shareholder agreement, DBLV was required to register DE BEERS as a trademark in the United States "as soon as practicable" after the agreement was signed. On January 16, 2001, DBLV TM filed eleven intent-to-use applications with the PTO for "retail store services," as well as for a variety of goods such as flatware, watches, clocks, perfumes, cosmetics, toiletries, luggage, purses, clothing, eyewear, stationery, glassware, and smokers' articles. Having only a license but not an assignment of the name DE BEERS for use in connection with gemstones and jewelry, however, DBLV TM did not submit an application to register DE BEERS in connection with gemstones and jewelry.

On June 18, 2001, the PTO determined that "retail store services" was "unacceptable as indefinite" and requested that DBLV TM specify the goods that would be sold. On December 14, 2001, DBLV TM refined its application to identify "[r]etail store services featuring luxury consumer products." The PTO again objected that the description was insufficiently specific: "[A]pplicant must specify the type of luxury goods, such as clothing, jewelry, fragrances, stationery, smoking articles, luggage, and china." On September 16, 2002, counsel for DBLV TM made a written request to the PTO that the agency reconsider its objection on the ground that the products offered in the retail stores "will be of a wide range and will change from time to time." Counsel for DBLV TM noted that DBLV TM would be competing with luxury retailers such as Cartier, which had been allowed to register its mark for "retail consumer goods and mail

---

**5.** Although not offered for the truth of any of its statements, the article sheds some light on why the plaintiffs have not called any witnesses from DBG to offer testimony at this trial, an issue of some significance, as discussed below. The article reports: "Barred from doing business directly in the United States because regulators have charged the company with antitrust violations, De Beers has been trying to find a way out of the legal stalemate and into the United States. De Beers will have no management role in the new company ..., an arrangement that analysts say was done with the primary objective of allowing the company to do business in its biggest potential market."

order services" without further specifying the goods to be offered. On October 12, 2004, the PTO published the mark DE BEERS for "retail store services featuring luxury consumer products."

Meanwhile, the plaintiffs chose a location for their first store in the United States, worked on the construction of the store, and opened it on Fifth Avenue in Manhattan on June 23, 2005. With that opening, DBLV TM filed an allegation of use with the PTO. On September 23, 2005, the trademark registration for luxury retail store services issued.

*Fame of the DE BEERS Mark*

The DE BEERS name has been used in advertising in the United States from the 1930s to promote the purchase of diamond jewelry generally. Ayer, who designed the ad campaigns for DBG until 1995, began placing ads on television in the 1970s, featuring the DE BEERS name and diamond jewelry. As of 1980 and 1981, when defendant Rosenblatt incorporated Syndicate, advertising prominently displaying the name DE BEERS in connection with diamonds was also appearing in major magazines such as *Time, Vogue,* and *The New Yorker.* During the 1980s, advertisements featuring the DE BEERS name and diamond jewelry appeared in about 85 magazines per year. The Ayer advertisements—which often featured the tagline "A Diamond Is Forever" and, in later years, silhouettes of women and men with diamond jewelry—are now widely regarded as some of the most successful marketing efforts of the 20th Century.

In 1995, DBG switched its account from Ayer to JWT. JWT continued to advertise the DE BEERS name and diamond jewelry on television and in magazines and newspapers. Ayer and then JWT also worked through an in-house unit called the Diamond Promotion Service to help members of the diamond trade, including retailers, develop promotions to sell diamonds. DBG also engaged in an advertising campaign around the turn of the millennium in 1999 and 2000 (the "Millennium Campaign"). The advertisements pictured diamond jewelry and prominently featured the DE BEERS name and the "A Diamond Is Forever" slogan. In addition to its paid advertising campaigns, DBG received a substantial amount of unsolicited press coverage. Between 1996 and 2000, such coverage steadily increased. In 1996, approximately 237 articles about DE BEERS [6] appeared in United States newspapers and magazines; by 2000, this number had grown to approximately 644. On occasion, the press referred to DBG and various of the De Beers Group companies as part of a "syndicate." Sixty such mentions appeared in United States publications between 1973 and 2004. Eleven of these articles contained the phrase "De Beers diamond syndicate."

This decades-long and expensive advertising campaign achieved strong public awareness for the name DE BEERS and its association with diamonds. In early 2000, about a year before the execution of the joint venture enterprise documents, DBG hired Leo J. Shapiro & Associates ("Shapiro") to survey consumers' awareness of the DE BEERS name in this country. Shapiro carries out a wide-ranging monthly survey of consumer behavior that also includes inquiries on behalf of a single corporate client. Questions about DE BEERS were incorporated into the April and May 2000 surveys. The survey uses a probability sample of the continental United States population. It is administered by telephone, and interviewers ask to speak with heads of household over 18

---

**6.** Certain publications omitted the space in the De Beers name, referring to the affiliated companies as "DeBeers." These mentions have been included in the discussion here.

years of age. Half of the respondents are male, and half are female. The survey results introduced by plaintiffs are based on the answers given by 900 respondents over the two-month period. Although the survey data was gathered in 2000, the report submitted by plaintiffs was compiled by Johnson, Shapiro's CEO, in January 2006.

The Shapiro survey showed that, unprompted, over 50% of respondents were familiar with the DE BEERS name, and that over one-quarter associated DE BEERS with diamonds. Awareness was even higher among consumers with household incomes of over $70,000 annually. Among those respondents who, through prompting or not, were familiar with DE BEERS and associated it with diamonds, about 60% believed that DE BEERS diamonds were of a higher quality.[7]

The brand DE BEERS has been identified by *Brandweek* and *Adweek* magazines as one of America's "superbrands." In the 2001 survey, DE BEERS diamonds was ranked 144th on the list of America's superbrands, above Campbell's soup and Hallmark greeting cards.

During 2005, the plaintiffs spent close to $4 million on advertising promoting the name DE BEERS. In November 2005, DBLV arranged for *Vogue, W,* and *Vanity Fair*, magazines in which it regularly advertised, to send an e-mail survey to their readers in the New York City area. Very few readers responded to the survey, but a sizeable majority of those who did respond were aware of DE BEERS as a company.

*The Success of the Plaintiffs' Business*

Before opening their Manhattan store, the plaintiffs had previously launched stores in London, Paris, and Tokyo. They now have a second store in the United States, a branch in Beverly Hills, California. DBLV intends to open as many as 18 additional DE BEERS stores in the United States in the next few years.

The Manhattan store's current product offering consists of diamond jewelry and watches, but DBLV plans to begin selling other luxury goods as well. None of the DBLV stores purchase their diamonds exclusively from DBG affiliates. Instead, they purchase their gemstones on the open market, competing with other retailers for higher quality diamonds. DBLV's stores do not offer loose diamonds for sale, although they sell them when asked. They do allow customers to select a diamond and match it with a setting of their choice, however, and that happens not infrequently.

In its first week alone, thousands of people visited the New York store each day. In the half year in which they were open in 2005, the two American stores had total sales of close to $5 million.

*Defendants*

Defendant Rosenblatt is the president, sole shareholder, and sole employee of defendant Syndicate.[8] His family has been connected with the diamond trade for three generations, always using some variation of the family name as its business name. Rosenblatt began working for his family's diamond business, located at 580 Fifth Avenue in Manhattan, in the mid–

---

7. Johnson's report was misleading in its presentation of the respondents' opinions about the quality of DE BEERS diamonds. It did not report that over one-quarter of those who associated the name DE BEERS with diamonds had no opinion on quality.

8. Although Rosenblatt testified that the name of his company is "Debeers", his corporate records and activities use the name "DeBeers," with a capital B. Thus, the plaintiffs use De Beers, with a space, and the defendants use the one word DeBeers in Syndicate's corporate name.

1950s. As a family business, it bought and sold diamond jewelry and loose diamonds, principally providing consignment merchandise to New York dealers and retailers. It did not sell to the public. Indeed, the public did not even have access to the floor on which its office was located.

In September 1981, after his father had died and when he was about 40 years of age, Rosenblatt formed DeBeers Diamond Syndicate, a Delaware corporation.[9] He decided that he wanted to reorient the family business toward the consignment of higher quality diamonds, and expected that his choice of the company's name would help to convey that intention. Rosenblatt asserts that he chose the name DeBeers because of what he describes as its "mythological association with diamonds." No one in his family, nor anyone associated with Syndicate, has the surname DeBeers or any other connection with the name DE BEERS. He testified that he added syndicate to the name because of its "cheeky" evocation of "a shadowy cartel that controlled the industry."

Rosenblatt understood that the name DE BEERS had powerful connotations. He and his fellow members of the New York City diamond trade used the name DE BEERS and the word syndicate to refer interchangeably to the cartel that they believed controlled the world's supply of rough diamonds. Rosenblatt's family in fact knew at least two "sightholders," that is, individuals who bought rough diamonds from the DE BEERS syndicate during the "sights" that were held in London for a week at a time, roughly ten times a year.

Syndicate was incorporated in Delaware, but had no other business address than the family business office at 580 Fifth Avenue in Manhattan.[10] Rosenblatt added the name of his new company to his office door, where it appeared along with his family name. A family friend who worked in the diamond trade testified that Rosenblatt's use of the DeBeers name provoked laughter in the industry because "it was a gutsy thing to do."

Although Rosenblatt asserts that Syndicate bought, consigned, and sold loose diamonds, he has not offered any documents confirming even a single commercial transaction under the corporate name. He has not shown that the corporation had business cards, filed tax returns, had a separate telephone listing, or conducted any business whatsoever. Indeed, he has not shown how a customer would have understood that any single transaction was being conducted through Syndicate as opposed to the Rosenblatt family business. What is clear is that Rosenblatt soon abandoned any interest in the corporation.

In 1986, Rosenblatt's mother died and he moved to Europe. By 1986, the corporation had become inoperative as a matter of law for its failure to file annual reports and non-payment of taxes. By the early 1990s, Rosenblatt had even given up the lease on his offices at 580 Fifth Avenue.

Learning that DBG and LVMH intended to launch a line of jewelry and open luxury retail stores employing the name DE BEERS in the United States, in late 2001, Rosenblatt decided to resurrect his corporation, but this time to use it to sell

9. Rosenblatt asserts that in the wake of the runaway inflation of the late 1970s, he believed that investors would be drawn to diamonds as a hedge against another inflationary spiral. The evidence suggests, however, that if Syndicate did business at all, it did so only in the wholesale market. There has been no indication that it actually pursued customers interested in hedging against inflation.

10. A trademark service search for the mark De Beers applied to diamonds that was conducted for Rosenblatt in 1981 revealed two New York businesses using the name De Beers: De Beers Diamond Abrasives and De Beers Diamonds Ltd.

polished, certificated diamonds over the Internet at "very competitive prices." [11] He believed that the use of the name DeBeers would allow his company to succeed where other internet diamond businesses had failed because the name "always had a special cachet as well as wide public recognition and acceptance."

As a first step, on January 15, 2002, Rosenblatt reactivated Syndicate as a Delaware corporation. The business address of the company is now the same as Rosenblatt's home address in Manhattan. It has no separate telephone number and has done no advertising. Syndicate has not contacted potential customers or dealers to advise them that it is going into business again. It is essentially dormant, awaiting the outcome of this litigation.

Rosenblatt has proceeded cautiously, well aware that he has no legitimate claim to the use of the name DeBeers. He decided that he would test the waters by filing for a trademark. In preparation for the filing of a trademark application, Rosenblatt's attorneys performed a Thomson & Thomson trademark search on January 17. The search found no active or pending registration of DE BEERS for diamonds, diamond jewelry, or the purchase and sale of diamonds and diamond jewelry. The first eleven references in the search, however, reflected filings in January 2001 by DBLV TM [12] to use the mark DE BEERS in connection with a variety of items, including retail store services, watches and clocks, flatware, and porcelain. The search also revealed several marks for fine jewelry or diamonds that had been abandoned in the face of opposition by the Jewelers Vigilance Committee, Inc., including attempts to register Debeersonline.com, Debeersonsale.com, Debeersusa.com, and Forever Yours Debeers Dia. Ltd. The lengthy search report also noted that DeBeers Consolidated Mines had run a print advertising campaign under the slogan "A Diamond Is Forever. DeBeers."

Undeterred by results of the search, on January 29, 2002, Syndicate filed two trademark applications with the PTO for the mark "DEBEERS DIAMOND SYNDICATE" for "diamonds," and for "purchasing diamonds for others, wholesale ordering services and distributorship of diamonds." The applications identified a first use date of June 1981, and a first use in commerce date of January 2002.

This latter reference was to a single sale arranged by Rosenblatt to create the appearance of a use in commerce. On January 20, 2002, Rosenblatt made a sale of a 1.51–carat diamond from his personal stock of gems to East Continental Gems, Inc. for $9,750. East Continental Gems is located at 580 Fifth Avenue. This is the only sale of a diamond that Syndicate contends that it has made since its reactivation.

In addition to submitting misleading evidence about the use of the mark in commerce, Rosenblatt made other misrepresentations to the PTO about the nature of his business enterprise, specifically, the extent to which the mark had been used in connection with any sale of goods or the provision of services. For example, despite Syndicate's representation to the

11. Although Rosenblatt asserts that he chose this moment, over fifteen years after abandoning this corporate vehicle, to revive the name DeBeers because he believed that the Internet presented a business opportunity to sell loose diamonds at discounted prices, that assertion must be rejected to the extent that he is using it to explain the timing of his reentry into the diamond business and the revival of his corporation.

12. Although the search identified the applicant as Rapids Trade Mark Limited, Rosenblatt admits that he understood it was filed by an entity related to DBG.

PTO that the mark "is used on or in connection with the above-identified services, by applying the mark to advertising and promotional materials for the services, and in other ways customary to the trade," Syndicate did not have any advertising or promotional materials. Rosenblatt, as president of Syndicate, also represented to the PTO that he believed that he was the "owner" of the mark, and that to the best of his knowledge,

> no other person, firm, corporation or association has the right to use the above-identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods or services of such other person, to cause confusion, or to cause mistake, or to deceive.

Contrary to this representation, Rosenblatt understood that his use of the mark would likely cause confusion.

The PTO required Syndicate to disclaim the words diamond and syndicate. After Syndicate agreed to do so, and after an examining PTO attorney found that his search of PTO records had uncovered "no similar registered or pending mark which would bar registration," the PTO published Syndicate's applications to register the mark in the Official Gazette for opposition on September 17 and October 1, 2002. Plaintiffs filed a timely opposition and eventually commenced this action in June 2004. As a result, proceedings in the PTO over the Syndicate applications are stayed.

Meanwhile, in April 2002, Rosenblatt contacted Vickery Hill, a website development firm, which created a proposal for an Internet site to allow Syndicate to both "advertise" its business and "sell diamonds online". Vickery Hill added to its proposal the representation that Syndicate "currently owns the domain name: de-

beersdiamondsyndicate.com and will be responsible for any trademark or copyright issues associated with it," because it was concerned about liability that might attach to Rosenblatt's use of the name DeBeers. Vickery Hill had never added such language to any other client proposal.

At approximately the same time, Rosenblatt's son prepared a preliminary design for a Syndicate website. The most prominent word on the site's opening page is the word "De Beers," that is, the identical name and spacing used in plaintiffs' mark. The first page is entitled "De Beers Luxury Diamond Search," and introduces a stylized logo "Simple Luxury De Beers," with an interlocking d and b for the name De Beers. Syndicate's corporate name does not appear on the proposal for the site. Rosenblatt testified that he will include a disclaimer on the site that will "disclaim any association with any foreign 'De Beers' entity that might or might not exist."

In May 2002, Rosenblatt began looking for investors in what he described as a project to "exploit[ ] the brand 'DeBeers' in the United States by means of e-commerce." He put together a document describing the enterprise, which he sent to at least one potential investor. The document notes that DeBeers was originally associated with a South African mining company beginning in the late 19th century. Although, according to the document, Syndicate had "no connection with the South African company," Rosenblatt hoped to use the "brand recognition" and "cachet" of the DeBeers name to build Syndicate's business.

In late 2002, Rosenblatt applied for and obtained approximately 35 Internet domain names involving variations on the name DeBeers.[13] Many of these registra-

---

**13.** On November 19, 2003, Syndicate extended the registrations for one year.

tions do not use the word syndicate, but are for names such as debeersdiamonds.biz, debeersdiamondswholesale.biz, debeersdiamondsdirect.com, and debeersdiamondsretail.net. Rosenblatt plans to launch the Syndicate website and begin making sales once the registrations have issued.

*Actual Confusion*

Although the defendants have not begun to operate a website, their application to register a trademark with the DeBeers name has already generated confusion. Capetown Diamond Corporation, a retail jeweler, placed an ad in the *New York Times* in July 2005 for a diamond ring and used the phrase "En Garde DeBeers" to communicate that his jewelry was less expensive than what could be purchased in plaintiffs' United States stores. He added a footnote to the advertisement, stating that DeBeers is "a registered trademark of DeBeers Diamond Syndicate Inc.," wrongly believing that the plaintiffs were responsible for the defendants' trademark application. Syndicate has also been named as a defendant in one lawsuit and contacted by plaintiffs' counsel in another litigation based on the mistaken belief that it was associated with DBG.

## CONCLUSIONS OF LAW

DBLV TM brings a claim for trademark infringement of its registered mark under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and both plaintiffs bring a claim for infringement of their unregistered and common law mark under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). They also bring a claim of unfair competition under New York common law, and a claim of dilution under New York Gen. Bus. L. § 360–*l*.

### I. Lanham Act Claims

■ To sustain a claim for trademark infringement under Sections 32 or 43(a), a plaintiff must first show that its mark is entitled to protection, and then that the defendant's use of the mark is likely to cause confusion. *Time, Inc. v. Petersen Publ'g. Co. LLC*, 173 F.3d 113, 117 (2d Cir.1999). Here, DBLV TM's Section 32 claim is based on its registration of DE BEERS in connection with luxury retail stores, which, plaintiff argues, gives it a protectable mark as of the filing of its application in January 2001. Plaintiffs' Section 43(a) claim is based on the argument that, pursuant to the famous marks doctrine, DBG obtained protectable rights in the DE BEERS mark, which it later transferred to plaintiffs.[14] Regardless of how plaintiffs' rights are construed, they argue, defendants' use of DE BEERS in connection with the sale of loose polished diamonds is likely to cause customers to be

**14.** Plaintiffs also claim that "DBG owned protectable rights in the United States by virtue of the 'analogous use' doctrine." It is not clear whether they intend to employ this theory to meet their burden of showing a use of the mark in commerce under the famous marks doctrine, or whether they proffer it as an alternate, free-standing source of rights under Section 43(a). In either case, their argument is rejected. For the reasons discussed below, plaintiffs will not be permitted to avail themselves of the famous marks doctrine without direct, substantial proof of use in commerce. Additionally, insofar as plaintiffs contend that they can obtain protectable rights in a mark *solely* through advertisements and press coverage, this view of Section 43(a)'s scope has never been adopted by this circuit. Indeed, the one case to which plaintiffs point to support their position, *Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc.*, No. 01 Civ. 2950, 2005 WL 2148925 (S.D.N.Y. Sept. 6, 2005), involved a company that had used the disputed mark on the packaging in which it shipped products to American customers. *Id.* at *7. There was no question that the name had been used in commerce, and therefore the court's discussion of "trade name" recognition is not relevant here.

confused about the relationship between plaintiffs' and defendants' products.

### A. Plaintiffs' Rights in DE BEERS

#### 1. Section 32

Section 32 provides, in relevant part:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

■ As noted above, plaintiff DBLV TM owns a federal registration for DE BEERS in connection with "retail store services featuring luxury consumer products." Registration of a trademark allows the owner to sue an infringer under Section 32 and creates a presumption that the mark is valid. *See* 15 U.S.C. § 1057; *see also Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Once a registration has issued, a registrant will be deemed to have priority as of the *filing* of the registration—here, January 16, 2001 (the "priority date"). 15 U.S.C. § 1057(c).

In other words, the rights of the mark's owner will trump those of anyone who, prior to filing, had not (1) used the mark, (2) filed an application with the PTO to register the mark, which is pending or has resulted in registration, or (3) filed a foreign application to register the mark and filed an application under Section 44(d) to register the mark in the United States, which is pending or has resulted in registration. *Id.* Even if a party shows that it obtained such rights before the claimed priority date, it may still be liable to the registrant if it is found to have abandoned the rights through lack of use. *See* 15 U.S.C. § 1127.

Defendants do not claim to have filed an application with the PTO or any foreign trademark agency prior to January 16, 2001. Moreover, as discussed more fully below, even if they had been able to show that they used DeBeers in commerce before the priority date, it is clear that they abandoned the rights. Their only remaining argument against recognition of plaintiffs' priority date of January 16, 2001, is that plaintiffs perpetrated fraud on the PTO in the process of applying for the registration. In particular, defendants allege that plaintiffs made a false statement and failed to disclose to the PTO that their product offering would sell diamond gemstones and jewelry, and that they lacked the rights necessary to trademark DE BEERS in connection with that category of products.

■ Fraud in procuring a trademark occurs when "an applicant knowingly makes false, material representations of fact in connection with an application." *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1351 (Fed.Cir.1999) (citation omitted). A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by "clear and convincing evidence." *Orient Exp. Trading Co., Ltd. v. Federated Dept.*

*Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988). The Trademark Trial and Appeal Board of the PTO has held that this is a "heavy burden" that requires the opposing party to present proof that leaves "nothing to speculation, conjecture, or surmise. Should there be any doubt, it must be resolved against the party making the claim." *Marshall Field and Co. v. Mrs. Fields Cookies*, 1992 WL 421449, 25 U.S.P.Q.2d 1321, 1328 (Trademark Tr. & App. Bd.1992). "Merely making a false statement is not sufficient to cancel a mark." *L.D. Kichler*, 192 F.3d at 1351.

■ Here, defendants have fallen short of meeting this heavy burden. Defendants first contend that DBLV TM falsely represented its intended product offering to the PTO by stating that "the products will be of a wide range and will change from time to time." Defendants note that the plaintiffs' core product is and always will be diamond jewelry. Therefore, they argue, the above statement was false to the extent it suggested that DBLV TM could not identify any products that would always be offered at plaintiffs' stores. This argument is frivolous. As a simple linguistic matter, the claim is not that *every* product will change, but that the product offering *as a whole* will change. Defendants have not contested plaintiffs' suggestion that they already do offer at least one product other than diamond jewelry, nor their stated intention to increase their non-jewelry

offerings. The statement, therefore, is not false.

■ Defendants also rely on the alleged omissions described above. In other contexts, the Second Circuit has repeatedly held that fraud can be committed by omission, not just misrepresentation. *See, e.g., Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir.2006) (common law fraud); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173–74 (2d Cir.2005) (securities fraud). In the absence of a fiduciary duty (which defendants do not allege here[15]), an omission is typically found to confer liability only where it is necessary to clarify an ambiguous or partial statement, or it causes another party to act on the basis of mistaken knowledge. *See, e.g., Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 155 (2d Cir.1995). That is not the case here.

Defendants claim that plaintiffs failed to state explicitly that their core product would be diamond jewelry and suggest that DBLV TM should have described its mark as covering "retail store services featuring diamond jewelry and other luxury products." The PTO's own Trademark Manual of Examining Procedure, however, deems the use of the terms "including," "comprising," "such as," "and the like," "and similar goods," and "like services" too indefinite to use in a trademark application.[16] As a result, they "are almost al-

15. Defendants do argue that plaintiffs owed a duty of "uncompromising candor" to the PTO. They point to no Second Circuit authority, however, identifying such a duty in the trademark context. Under 37 C.F.R. § 1.56(a), a *patent* applicant has a "duty of candor and good faith in dealing with the [PTO]," but defendants have not shown that a *trademark* applicant is subject to the same requirement. In any event, even in the patent context, the regulations explicitly state that the duty does *not* require an applicant to "submit information which is not material to the patentability of any existing claim." *Id.*

As discussed below, defendants have not shown that the information allegedly omitted by DBLV TM was material to the PTO's decision. Therefore, even if a duty of uncompromising candor were applicable here, plaintiffs' conduct did not violate it.

16. Defendants appear to have misinterpreted the PTO's request that DBLV TM phrase its application as follows: "Retail store services featuring _____ (the applicant must specify the common commercial name of the goods sold, such as jewelry, clothing)." The PTO could not have been requesting that DBLV

ways unacceptable." United States Patent and Trademark Office, Trademark Manual of Examination Procedures § 1402.03 (4th ed. April 2005). Defendants' argument, therefore, amounts to a suggestion that DBLV TM committed fraud by failing to submit an application that would almost certainly have violated the PTO's guidelines. This contention is rejected.

Finally, defendants claim that DBLV TM failed to disclose to the PTO that it *could not* register DE BEERS in connection with gemstones and jewelry because, to the extent it possessed any such rights in the mark, it did so pursuant to a license, rather than an assignment. This argument fails for a number of reasons. First, the PTO did not request such information. Second, the omission of this material did not make any of the plaintiff's other statements ambiguous or misleading, much less false. The shareholders' agreement that governs the scope and conduct of plaintiffs' business provides that their product line "will be consistent with the types of products sold by luxury goods retailers." Plaintiffs' representations to the PTO regarding their product offerings is entirely consistent with the agreement: They told the PTO that the product line would change from time to time, and they likened their application to one filed by Cartier, a well-known luxury goods retailer whose primary product offering is jewelry.

Third, plaintiffs have not shown that the omission materially affected the PTO's ac-

tions. It is clear from the shareholders' agreement and the GBL that, regardless of whether Intangibles or Trademarks currently owns the rights to use DE BEERS in connection with gemstones and jewelry, the owner intends for plaintiffs to be able to exploit these rights in the United States. Plaintiffs were not trying to fool the PTO into allowing them to profit from a mark that the rightful owner was hoping to exploit. Rather, they were attempting to carry out the owner's wishes. Therefore, it seems unlikely that the PTO would have looked less favorably on plaintiff's application had it known that it was unable to register a mark for diamond jewelry.[17]

In sum, defendants have not shown that DBLV TM perpetrated a fraud on the PTO when it filed for registration of the DE BEERS mark in connection with luxury retail store services. Plaintiffs are entitled to rely on a priority date of January 16, 2001 in connection with the Section 32 claim.

2. Section 43(a)

■ Section 43(a) provides in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

TM list examples of the types of products it would sell, as that would have contradicted its rules. Indeed, in the paragraph that follows the above sentence, the PTO reminded DBLV TM that "while an application may be amended to clarify or limit the identification, additions to the identification are not permitted." In other words, if DBLV had specified what it would offer at its stores, it would have had a registered trademark only for those goods and no others. *See* 37 C.F.R. § 2.71(a) ("The applicant may amend the application to clarify or limit, *but not to broaden*, the identi-

fication of goods and/or services.")(emphasis supplied). Subsequent to DBLV TM's application, the PTO issued a notice of allowance for the marks HARRODS and HARRODS KNIGHTSBRIDGE for "retail store services featuring luxury consumer products."

**17.** This is particularly true, given that DBLV TM was registering a *services* mark in class 35, and not a mark for use in connection with a product, which, if it had been for gemstones and jewelry, would have been in class 14.

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). To establish that a mark is covered by Section 43(a), a plaintiff must demonstrate that it is protectable, and that plaintiff has engaged in "prior use and ownership." *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

■ Although the language of Section 43(a) imposes a requirement of "use[ ] in commerce" only on the party who is alleged to have infringed an unregistered mark, courts impose the same requirement on plaintiffs who claim such infringement. *De Beers*, 2005 WL 1164073, at *7. Here, plaintiffs have offered no competent evidence that either they or DBG used DE BEERS as a mark in the United States prior to 2005.[18] They seek to circumvent the requirement, however, by invoking the "famous mark" doctrine. Under this doctrine, plaintiffs argue, DBG acquired trademark rights in the DE BEERS name by conducting business abroad under the mark.

■ The famous marks doctrine is a "controversial common-law exception" to the principle that the use of a mark overseas cannot form the basis for a holding of priority trademark use. *Id.* Under the doctrine, a foreign mark is protectable despite its lack of use in the United States "where the mark is so well known or famous as to give rise to a risk of consumer confusion if the mark is used subsequently by someone else in the domestic marketplace." *Id.* (quoting *ITC Ltd. v. Punchgini, Inc.*, 373 F.Supp.2d 275, 286 (S.D.N.Y. 2005)). The Second Circuit has expressly declined to reach the issue of whether to recognize the famous marks doctrine. *See Empresa Cubana Del Tabaco v. Culbro Corp.*, 399 F.3d 462, 475 (2d Cir.2005). As the Court has previously discussed in more detail, *see De Beers*, 2005 WL 1164073, at *8–9, significant prudential considerations augur in favor of recognizing the doctrine. As a result, it would be applied here "if appropriate." [19] *Id.*

■ Defendants offer two reasons for the Court to find that the famous marks doctrine is inappropriate here. First, defendants urge that the plaintiffs should not be allowed to "take advantage of" the doctrine, contending that the Second Circuit's *Empresa* decision stands for the proposition that an entity that does not do business in the United States "for legal reasons" cannot avail itself of the famous marks doctrine. The holding, however, is not so broad. In *Empresa*, the Circuit declined to allow a Cuban company to obtain trademark rights via the famous

18. Plaintiffs claim that DBG allowed De Beers-branded diamonds to be sold in the United States in 1999 and 2000 as part of their Millennium Campaign. They have not, however, provided sufficient admissible evidence to allow reliable fact-finding of what was sold, much less when, where, by whom, and to whom it was sold. As a result, the evidence is inadequate to show that the promotion constituted a use of the mark in commerce in the United States.

19. As defendants point out, another court in this district recently disagreed with this Court's recognition of the famous marks doctrine. *See Almacenes Exito S.A. v. El Gallo Meat Market, Inc.*, 381 F.Supp.2d 324, 327 (S.D.N.Y.2005). Because the Second Circuit has not yet resolved this divergence, the Court's previous ruling on the issue remains the law of the case.

**270**

marks doctrine because such a result would have amounted to a "transfer of property rights ... in violation of the [federal] embargo." *Empresa,* 399 F.3d at 476. Here, defendants do not allege that DBG was subject to such an absolute bar to conducting business in the United States. Instead, they argue that DBG avoided United States jurisdiction because it feared it would face a variety of legal actions if it did business in the country. Defendants do not, however, point to any cases indicating that an entity's *motivation* for not using a mark in the United States is relevant to the applicability of the famous marks doctrine. Therefore, DBG's choice to avoid doing business in the United States—whatever its reasons for making it—does not preclude it from obtaining American rights to a mark it used overseas.[20]

■ Defendants' second argument, however, poses a more serious challenge to DBG's claimed rights. They claim that, regardless of the fame of DE BEERS, DBG never used it *as a mark.* The Act defines a "trademark" to include "any word, name, symbol, or device, or any combination thereof used by a person ... to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. A mark is considered to be used in connection with goods when "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto ..." *Id.* It is deemed to be used in connection with ser-

vices "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce ..." *Id.* Fundamentally, then, rights in a mark do not arise through "mere adoption," but only out of actual use. *Buti v. Perosa, S.R.L.,* 139 F.3d 98, 103 (2d Cir.1998) (*quoting United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918)).

■ Here, plaintiffs have put themselves in the awkward position of trying to prove that DBG used the DE BEERS mark in foreign commerce without actually submitting any testimony from De Beers Group employees. Indeed, they have consistently fought to keep virtually all evidence of DBG's activities from coming into evidence at trial. Whatever other advantages plaintiffs may have seen in this strategic choice at the time, it now makes it exceedingly difficult for them to rely on a doctrine that turns entirely on the activities of DBG.

The evidence plaintiffs have submitted regarding DBG's business is scattered and piecemeal. It has been possible, however, to piece together a picture of the DBG enterprise, based largely on press clippings presented by plaintiffs as evidence of the fame of the mark.[21] It appears that for much of the 20th century, DBG dominated the global diamond trade, controlling mines that produced as much as 85 percent of the world's "rough" uncut diamonds. They sold these stones to a small group of dealers, cutters, and polishers, through the Central Selling Organization ("CSO") in London.[22] These sales, or

**20.** It is for this reason that, through a ruling on a motion *in limine* made by plaintiffs before trial, evidence proffered by defendants of the legal problems and controversial business practices of DBG was excluded from the trial.

**21.** Because most of these articles are hearsay, they were not admissible for the truth of the facts contained therein. As a result, this dis-

cussion is provided as context, but is not part of the findings of fact.

**22.** The CSO is either related to, or also known as, the Diamond Trading Company. These companies, like some of the others within DBG, do not use De Beers in their names. Nonetheless, the trial testimony of both plaintiffs' and defendants' witnesses indicates that

"sights," allowed DBG to exert enormous influence over the global price of diamonds by controlling the quality and quantity of gems released for sale each year.

DBG companies have apparently registered DE BEERS for use in connection with gemstones and jewelry in dozens of countries. They have not done so in the United States. DBG has been the subject of multiple lawsuits in the United States, including at least one antitrust action brought by the Government. As a result, DBG has avoided doing business directly in the American market, and its executives avoid travel to the United States. As already noted, some press reports speculate that the structure of DBLV—in particular, its independence from DBG—was driven by DBG's desire to circumvent the legal obstacles to its operating in the United States.

DBG's control over the diamond market has apparently fallen in recent years. This decline has been linked to the discovery of new mines, political turmoil in various African countries, and the enormous expense of DBG's efforts to keep prices high by "soaking up" excess diamonds on the world market. In part because of its loss of control over the diamond market, DBG began looking for new avenues of business, eventually deciding to enter and leverage the power of the DE BEERS name in the retail market. This led to the formation of the companies that are plaintiffs in this action.

Plaintiffs have consistently opposed the defendants' efforts to submit evidence of DBG's turbulent past, as well as its alleged bad acts, including its purported anticompetitive practices and its claimed connection to the so-called "conflict diamond" trade. For instance, prior to trial, the Court granted plaintiffs' motion *in limine* preventing defendants from introducing a DBG annual report. Similarly, during discovery, plaintiffs succeeded in quashing defendants' efforts to depose Gary Ralfe, a director of DBLV and chairman of the board of DBLV TM, about his activities as a managing director of DBG. Further, plaintiffs seem to have acceded to the apparent desire of DBG executives to avoid depositions and American discovery.

As a result, the evidence that DBG used DE BEERS as a mark is fragmented. Diamond testified that she attended trade shows where DBG operated booths marked with the DE BEERS name, and visited the company's offices and mines in England and Africa, which also displayed the DE BEERS name; Parker observed DBG's sale of rough diamonds in London at sights, although she was not sure whether they were made under the DE BEERS name; Leymarie testified that while he worked at Cartier, DBG approached him about supplying the company with diamonds; Scheer admitted that on his company website, he describes the firm as being "sightholders of De Beers' for finished products"; and Rosenblatt himself admitted in his presentation to a potential investor that "DeBeers [was] synonymous with both diamonds and a monolithic international cartel that controlled the worldwide distribution of 'rough' (uncut) diamonds." Plaintiffs also introduced a 1981 article from *Business Week* that states that De Beers controlled 85% of the world's uncut diamonds.

■ Although such evidence is both admissible and probative of DBG's use of DE BEERS as a mark, it is insufficient to establish such use for the purposes of the famous marks doctrine in this case. As noted above, the doctrine is controversial

---

each of the companies in the consortium, as well as the consortium itself, are commonly referred to in the industry as "De Beers" or the "syndicate."

and has not yet been recognized by the Second Circuit. Furthermore, because the doctrine is an abrogation of the territoriality principle, a fundamental element of trademark law, courts must be extremely cautious when applying it. *See, e.g., Grupo Gigante SA De CV v. Dallo & Co., Inc.,* 391 F.3d 1088, 1097 (9th Cir.2004) (expressing concern about the potential of the famous marks doctrine to eliminate the territoriality principle altogether by encouraging courts to treat "foreign uses of the mark just as we treat domestic uses").

Here, there are undoubtedly dozens of officers and executives of DBG who could have testified about the companies' activities based on first-hand knowledge. Plaintiffs, however, decided not to call any of them as witnesses, and chose actively to oppose defendants' efforts to bring other competent evidence about DBG into the case. An added wrinkle here is that, to the extent plaintiffs have shown that DBG used the DE BEERS mark, the evidence was largely associated with the sale of raw, unpolished diamonds. In the United States, however, the mark's fame among consumers derives principally from its association with diamond jewelry—a product that DBG has apparently never sold. Under these circumstances, and given the potential of this controversial doctrine to alter substantially the landscape of trademark law, defendants have not proffered enough evidence to find that any rights in DE BEERS accrued to DBG under the famous marks doctrine.

### B. Defendants' Rights in DE BEERS

 Defendants do not own a registered mark in DE BEERS. Therefore, their rights in the mark, if any, must derive from "prior use and ownership." *Virgin Enters.,* 335 F.3d at 146. "To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory."

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271–72 (2d Cir.1974). In other words the proponent must show "a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade. Absent these elements, no trademark can be created or exist." *Id.* at 1274. The user who first appropriates the mark may prevent others from using it, "as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." *Id.* "Determining what constitutes sufficient use for trademark ownership purposes is obviously a case-by-case task.... [T]he balance of the equities plays an important role in deciding whether defendant's use is sufficient to warrant trademark protection." *Id.* at 1274 n. 11.

#### 1. The Early 1980s

Defendants claim that during the early 1980s, Syndicate bought and sold Gemological Institute of America ("GIA") stones under the name "DeBeers Diamond Syndicate." Other than showing that Rosenblatt put the company name on the door of his family business, an action which apparently caused some amusement among occupants of the building, the defendants have not shown through credible evidence that Syndicate engaged in commercial activity during this period. For instance, defendants have not produced any documents that evidence a single purchase or sale under the Syndicate name.

 Moreover, even if Syndicate *had* established rights in DE BEERS during this period, it abandoned them through disuse of the name between 1986 and 2002. Abandonment occurs when a mark "has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. Because intent is difficult to prove directly, it "may be inferred from circumstances.

Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." *Id.*[23] "A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate." *Silverman v. CBS Inc.*, 870 F.2d 40, 47 (2d Cir.1989). A bare assertion of possible future use is not enough. *Id.*

It is uncontested that defendants did not use the Syndicate name for more than 15 years—indeed, they admit that the corporate entity was inactive between 1986 and 2002. This period far exceeds the length of time specified by the Act as prima facie evidence of abandonment. Defendants cannot rebut that presumption. They claim that "poor economic conditions" in the mid–1980s prevented Rosenblatt from continuing the business, and that he "always intended to continue the business when conditions were right." Apart from this bare assertion, however, defendants have offered no support for their claim of an ongoing plan to resume use. Conversely, there is ample evidence indicating that Rosenblatt simply abandoned not just the corporate vehicle but the family diamond business altogether. He moved to Europe, opened a gallery, and, though he maintained a residence in New York, he gave up the lease on the offices at 580 Fifth Avenue.

### 2. Recent Use

Rosenblatt revived Syndicate on January 15, 2002. Five days later, he sold a single diamond to East Continental Gems, Inc. for $9,750. Defendants have not presented any evidence of other purchases or sales by Syndicate since the revival.

Courts typically do not deem usage sufficient "when it is obviously contrived solely for trademark maintenance purposes." *La Societe*, 495 F.2d at 1273. This is clearly the case here. The sale was not a bona fide use of the mark in commerce. In any event, defendants' recent use of the mark comes too late to defend against plaintiffs' Section 32 claim. Plaintiffs have established a first use date of January 16, 2001. Therefore, plaintiffs have shown priority over defendants with respect to their use of the mark in connection with luxury retail stores.

### C. Likelihood of Confusion

In order to succeed on the Section 32 claim, plaintiffs must show that defendants' use of "DeBeers Diamond Syndicate" is "likely to cause confusion in the marketplace." *Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir.2005); *accord* 15 U.S.C. § 1115(1). Plaintiffs claim infringement of their registered mark for luxury retail stores, despite the fact that it does not explicitly cover jewelry. The various protections that are created by a registered trademark are generally limited to the use of the mark "in connection with the goods or services specified in the certificate. ..." 15 U.S.C. § 1057(b). Nonetheless, a trademark owner has "rights against use on related, noncompeting products ... in accord with the realities of mass media salesmanship and the purchasing behavior of consumers." *Scarves by Vera, Inc. v. Todo Imps. Ltd. (Inc.)*, 544 F.2d 1167, 1172 (2d Cir.1976). The extension of trademark protection to related products guards against improper

**23.** Prior to the amendment of the Lanham Act, which took effect in January 1996, the statute specified two years as the length of time that could establish a presumption of abandonment. Since defendants did not use the mark for at least 15 years, this change has no impact on the result here.

restraints on the "possible expansion of the senior user's market, including consumer confusion, tarnishment of the senior user's reputation, and unjust enrichment of the infringer." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987). The market for luxury goods is sufficiently related to the market for gem-grade polished diamonds to justify an inquiry into whether defendants' products are likely to cause confusion with plaintiff's retail stores. *See Scarves by Vera*, 544 F.2d at 1174.

To establish that defendants' sale of diamonds under the Syndicate name is likely to cause confusion with plaintiffs' products and services, plaintiffs must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Playtex Products, Inc. v. Georgia–Pacific Corp.*, 390 F.3d 158, 161 (2d Cir.2004) (citation omitted). Confusion giving rise to a claim of trademark infringement includes confusion as to "source, sponsorship, affiliation, connection, or identification." *Star Industries, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir.2005) (citation omitted). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.* at 384 (citation omitted). Affiliation confusion exists where use of a "unique and recognizable identifier" could lead consumers to "infer a relationship" between the trademark owner and the new product. *Id.* (citation omitted).

To determine whether confusion is likely to arise, courts in the Second Circuit apply the eight-factor test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). These factors are: (1) the strength of the plaintiffs' mark; (2) the similarity between the marks; (3) the proximity of the products or services; (4) the likelihood that the plaintiffs will "bridge the gap" between their offerings and those of the defendants; (5) evidence of actual confusion; (6) evidence of bad faith on the part of the defendants; (7) the quality of the defendants' product; and (8) the sophistication of the relevant customers. *Id.*

> In balancing the *Polaroid* factors, courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins. Instead, the court should focus on the ultimate question of whether consumers are likely to be confused.

*Natural Organics*, 426 F.3d at 578 (citation omitted).[24]

1. Strength of the Mark

> [T]he distinctiveness or 'strength' of a mark measures its capacity to indicate the source of the goods or services with which it is used. The greater the distinctiveness of the mark, the greater the likelihood that prospective purchasers will associate the same or a similar designation found on other goods, services, or businesses with the prior user.

---

24. Defendants argue that, in performing this analysis, the Court must take into consideration the PTO's determination that "no similar registered or pending marks" existed at the time of defendants' application. While it is appropriate to "accord weight" to an initial determination of a PTO examiner, *see Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 148 n. 11 (2d Cir.1997), *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 392 (2d Cir.1995), a district court must resolve the issue of likelihood of confusion "not by reference to a registration determination by the PTO but by application of the multi-factor balancing test set forth in *Polaroid*." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 744 (2d Cir.1994) (citation omitted).

*Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997) (citation omitted). "Strength" in this context encompasses two concepts:

The first and most important is inherent strength, also called 'inherent distinctiveness.' ... The second sense of the concept of strength of a mark is "acquired distinctiveness," i.e., fame, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition.

*Virgin Enters.*, 335 F.3d at 147. "If a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use." *Id.* at 148.

■ The DE BEERS mark possesses both inherent and acquired distinctiveness. As a mark registered without proof of secondary meaning, it is entitled to the "rebuttable presumption that the mark is more than merely descriptive." *Arrow*, 59 F.3d at 393 n. 6. Defendants have presented no evidence to rebut this presumption. In addition, the mark has acquired further distinctiveness through plaintiffs' advertising and publicity efforts. Plaintiffs have sponsored high-profile launch parties for each of its stores and have received widespread newspaper, magazine, and television coverage of their retail enterprise. Their stores have already achieved significant sales. Although much of consumers' familiarity with the mark can be attributed to the decades-long advertising campaign of DBG, plaintiffs' efforts have built on the pre-existing fame.[25] Therefore, plaintiffs have shown that the DE BEERS mark is strong and is accordingly entitled to robust protection. This factor favors plaintiffs.

## 2. Similarity Between the Marks

■ When the secondary user's mark "is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them." *Virgin Enters.*, 335 F.3d at 149. In making that assessment "courts look to the overall impression created by the logos and the context in which they are found and consider the totality of the factors that could cause confusion among prospective purchasers." *Star Indus.*, 412 F.3d at 386 (citation omitted).

**25.** Defendants' additional suggestion that DBG allowed the mark to become generic by failing to police it is spurious. As a matter of logic, in order to demonstrate that a mark was not policed, a defendant must show that the mark was used by parties that did not possess any rights to do so. Here, defendants point to DBG's sponsorship of a "generic" advertising campaign, as well as promotional materials featuring the DE BEERS name that were sent to jewelers. Defendants have not, however, shown that these were unauthorized. Indeed, the only evidence seems to indicate that the materials were not just authorized by DBG, but created at their request.

To the extent that defendants also argue that the mark became "generic" because it was used in the promotion of diamonds generally, this contention must fail too. While defendants are correct that an entity can forfeit its rights in a mark if the mark becomes associated with a category of products generally and ceases representing an individual producer, that is not what has happened here. Courts have found "thermos," "aspirin," and "walking fingers" to be generic because the "common usage" of these terms had lost any connection to individual brands. *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570 (Fed.Cir.1995)(walking fingers); *King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 579 (2d Cir.1963) (thermos); *Bayer Co. v. United Drug Co.*, 272 F. 505, 510–515 (S.D.N.Y.1921)(aspirin). But DE BEERS does not fall into this category. While a consumer might request "aspirin" from a pharmacist without any expectation of receiving a certain brand, no purchaser of diamond jewelry would use "DE BEERS" in the same way. The primary objective of the DBG advertising campaigns may have been to boost the sale of diamonds generally, but the advertisements did not genericize the name DE BEERS.

276

■ Because defendants' mark has been used in commerce on, at most, one occasion, there are few contextual clues on which to rely in assessing the marks' similarity as they are used in the marketplace. In the single invoice produced by defendants, Syndicate's name appears at the top, in a relatively standard font, as "De-Beers Diamond Syndicate." Plaintiffs' mark is simply DE BEERS. A variation as slight as an omitted space does not serve to create a legally recognizable distinction between De Beers and DeBeers. *See Virgin Enters.*, 335 F.3d at 149. The proposal for defendants' website prepared by Rosenblatt's son even adds the space so that the plaintiffs' and defendants' marks are identical. Moreover, DeBeers is clearly the dominant element in the Syndicate name. Rosenblatt admitted as much in a business plan he provided to a potential investor: "[Syndicate] believes that the most significant problems [in selling diamonds on line] have been 1) the lack of brand recognition, and 2) consumer lethargy ... The DeBeers name will solve the first problem." For this reason, the website mock-up prominently displays the name "De Beers" alone and does not even include the full corporate name. The same is true for many of the domain names registered by Rosenblatt.

Defendants have not argued, and could not do so successfully, that the addition of either or both of the words "diamond" and "syndicate" ameliorates the likelihood of confusion. Of course, the PTO required defendants to disclaim both words when applying for registration, since neither is protectable. Plaintiffs have also shown that DBG companies were often referred to, both in the media and within the diamond industry, as the "syndicate." Further, American consumers strongly associate the De Beers name with diamonds. Given the near identity of De Beers and DeBeers, and given that the remainder of the Syndicate name serves to increase, rather than reduce, the implied connection between the corporate defendant and the plaintiffs' mark as it is used in commerce, the two marks are not just similar but virtually identical. This factor favors plaintiffs.

3. The Proximity of the Product and Service Offerings

■ The inquiry into the proximity of the offerings "concerns whether and to what extent the two products compete with each other." *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 140 (2d Cir.1999) (citation omitted).

> When the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source. In contrast, the closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source.

*Virgin Enters.*, 335 F.3d at 150. We look to the nature of the products themselves and the structure of the relevant market. Because the ultimate goal of the inquiry is to "determine whether the two products have an overlapping client base that creates a potential for confusion," *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 134 (2d Cir.2004), a plaintiff need not show that defendants' products compete directly with its offerings in order to prevail. *Virgin Enters.*, 335 F.3d at 150.

■ Plaintiffs' primary product offering is diamond jewelry. Defendants' sole offering will be polished diamonds, which are almost always used in jewelry. The connection between the two is both close and likely to be intuitive to consumers. This conclusion is not changed by the fact that plaintiffs operate retail stores that

sell directly to consumers, whereas defendants' only sale to date was to a wholesaler. Defendants' business plan describes Syndicate's business as "sell[ing] unmounted certified diamonds to the public" and compares Syndicate to an "on-line Walmart or K–Mart." Defendants clearly intend Syndicate to become a consumer-oriented enterprise if the business is allowed to proceed under the current name. This increases the likelihood that their customer base will substantially overlap with those of plaintiffs.

The defendants argue that any overlap will be negligible because they will offer diamonds at "discount" prices, while plaintiffs sell jewelry to consumers who are not price-conscious. The defendants have not shown such a separation in the markets. The defendants plan to offer only certificated, gem-quality stones; the plaintiffs already offer items for sale that range well below $1,000. Even the very affluent may be reluctant to pay more than what appears to be a reasonable market price for the quality of the stone in their item of jewelry. This factor favors plaintiffs.

### 4. Likelihood that Plaintiffs Will "Bridge the Gap"

■ Bridging the gap refers to the likelihood that the senior user (here, plaintiffs) will enter the market of the junior user (here, defendants) in the future, or that consumers will perceive that this is likely to occur. *Star Indus.*, 412 F.3d at 387. "This factor is designed to protect the senior user's interest in being able to enter a related field at some future time." *Savin Corp. v. Savin Group*, 391 F.3d 439, 459–60 (2d Cir.2004) (citation omitted).

■ As described above, the relationship between plaintiffs' and defendants' businesses is exceedingly close already. To the extent the defendants' market is described as the sale of individual certificated diamonds, the plaintiffs have already entered that market. The GBL identifies loose diamond gemstones—precisely the product that defendants intend to sell—as one of the items that "shall represent a substantial proportion of the products offered" by plaintiffs' stores. The plaintiffs allow customers to select separately the diamond and the setting in which they want the diamond to be mounted. To the extent that the defendants' market is identified by its channel of trade, the Internet, the plaintiffs may enter that market, as well. The plaintiffs already advertise their stones over the Internet and are exploring selling their branded jewelry through other high-end stores and on line, although those plans are far from settled. Therefore, this factor favors plaintiffs.

### 5. Evidence of Actual Confusion

■ Actual confusion need not be shown to prevail under the Lanham Act "since actual confusion is very difficult to prove and the [Lanham] Act requires only a likelihood of confusion as to source." *Savin*, 391 F.3d at 459 (citation omitted). Although it is not a requirement, "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." *Virgin Enters.*, 335 F.3d at 151. Since defendants have not yet used their mark in commerce, data regarding actual confusion among consumers, which would ordinarily be difficult to develop in any context, is impossible to obtain here.[26]

**26.** Defendants' suggestion that plaintiffs' failure to present survey evidence on the likelihood of confusion should be counted against them is unavailing. "While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey mirrors the real world setting which can create an instance of actual confusion." 3 McCarthy on Trademarks § 23:2.1 (2005). Here, because Syndicate has not begun selling diamonds under its corporate name, a recreation of the "real world" is not possible,

██ Nonetheless, as discussed above, one jeweler and multiple plaintiffs filing lawsuits have already misapprehended the relationship between defendants and DBG. Particularly in light of defendants' lack of use of the mark to date, this is unusually probative of the threat of confusion among consumers posed by Syndicate's operation. This factor favors plaintiffs.

## 6. Defendants' Bad Faith

██ The inquiry into willfulness or bad faith "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." *Savin Corp.*, 391 F.3d at 460 (citation omitted). The Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith, even in the total absence of a trademark search," although bad faith "may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Star Indus.*, 412 F.3d at 389. Where there is evidence of a junior user's knowledge of an earlier mark, courts have, on occasion, found good faith "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation." *Id.* at 388.

██ In placing his corporate name on his office door in 1981, Rosenblatt sought to signal to other New Yorkers in the diamond trade who were familiar with the Rosenblatt family business that he was reorienting it from the consignment of diamond jewelry and gemstones generally to the consignment of better quality diamonds. He intended each of the words in the corporate name to resonate with diamond merchants because of the connection each of the words—De Beers, diamonds, and syndicate—had in their minds with DBG. It is doubtful, however, that he expected his customers to be confused as to the source of any merchandise they might take from him on consignment. In that closed market, his customers would have understood the name as the latest iteration of the Rosenblatt family business and would not have believed that DBG or an entity associated with it had chosen to set up shop in New York by moving into the Rosenblatt offices.

The resurrection of the corporate name in 2002, however, is a horse of a different color. Again, the defendants intended to capitalize on the name recognition and goodwill created by DBG. This time, however, they also intended to deceive the public and sow confusion. This is true in the choice of Internet domain names, the attempt to obtain trademark registration, and the business plan for operating over the Internet.

Far from helping the defendants, their decision to proceed after a Thomson & Thomson search is damning. To the extent Rosenblatt was operating under any delusion that a DBG-related entity would not enter the United States to do business and thus would leave him room to mislead consumers about the sponsorship and source of his products, once he saw the search results, he knew otherwise. It showed a policing effort by the Jewelers' Vigilance Committee and eleven applications to register DE BEERS by a DBG affiliate. At that point, Rosenblatt's decisions to apply for his own registrations, to obtain a website design proposal, and to seek investment dollars, were done entirely in bad faith.

## 7. Quality of the Products

██ The difference in the quality of the products is one of the less probative factors in a determination of the likelihood of confusion. *Virgin Enters.*, 335 F.3d at 151. Indeed, differing quality goes more

and no negative inference will be drawn from the lack of survey evidence.

to the harm that confusion can cause than it does to the likelihood of confusion. *Id.* at 152. While a marked difference in quality might harm a mark-holder more, it would also "militate against finding a likelihood of confusion" as customers are less likely to assume a high quality senior user would produce low-quality products. *Star Indus.*, 412 F.3d at 389.

■ Defendants having sold at most one diamond, it is difficult to judge what quality differential, if any, will actually exist between plaintiffs' and defendants' offerings. This factor has no effect on the Court's determination of the likelihood of confusion.

### 8. Sophistication of the Consumers

■ The inquiry into consumer sophistication "considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (citation omitted). As a general matter, "the greater the value of an article the more careful the typical consumer can be expected to be." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979).

■ Diamonds are perhaps *the* iconic luxury good and are, of course, extremely expensive. It is reasonable to assume that the typical consumer will spend more time considering the purchase of a diamond than almost any other good he or she buys. Plaintiffs are correct that consumer sophistication is not an absolute bar against confusion. On balance, however, this factor weighs in defendants' favor.

### 9. Balancing the Factors

■ Of the eight factors courts in this circuit use to judge the likelihood of confu-

sion, six favor plaintiffs, and only one—the sophistication of the relevant consumers—favors defendants. While this outcome points undeniably toward a finding that confusion is exceedingly likely, such a detailed analysis seems almost superfluous in this case. After all, the "ultimate question" that the *Polaroid* factors aim to answer is whether consumers are likely to be confused—and here, Rosenblatt has all but admitted that his primary reason for choosing the name DeBeers was to benefit from consumers' false impression that he was affiliated with DBG and, therefore, with plaintiffs, as well. DBLV TM has established that defendants have infringed on their registered trademark for retail store services featuring luxury goods in violation of Section 32 of the Lanham Act.

## II. New York State Unfair Competition Claim

■ Under New York common law, "the essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 408 (2d Cir.1997) (citation omitted). To prevail on a claim of unfair competition, a plaintiff must show "(1) likelihood of confusion and (2) bad faith." *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.Supp.2d 247, 284 (S.D.N.Y. 2002). As discussed above in the context of the Lanham Act claims, plaintiffs have made both necessary showings: defendants' use of DeBeers is all but guaranteed to cause confusion among consumers; and it was the desire to benefit from this very confusion that motivated Rosenblatt to renew his efforts to use the mark in the first place. DBLV TM therefore prevails on its claim of unfair competition under New York common law.[27]

---

**27.** This claim was brought on behalf of both

plaintiffs. Because DBLV TM has clearly es-

III. New York State Dilution Claim

■ Section 360–*l* of the New York General Business law provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360–*l*. "New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are inherently distinctive." *N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC,* 293 F.3d 550, 557 (2d Cir.2002). Secondary meaning exists where "the public is moved in any degree to buy an article because of its source." *Genesee,* 124 F.3d at 143 n. 4 (citation omitted). Factors that are considered in determining whether a mark has developed secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." *Id.* (citation omitted).

Here, a detailed consideration of each of the factors is not required. Plaintiffs have shown that DBG engaged in a long-term and extremely successful and expensive advertising campaign, and received substantial press coverage. Plaintiffs have also demonstrated that many American consumers know the name DE BEERS and associate it with diamonds. The plaintiffs' two stores have made substantial sales in the short period they have been opened. Given this evidence, plaintiffs have comfortably cleared the burden of establishing that consumers are "moved in any degree to buy an article because of its source." *Id.* (citation omitted). Therefore, the mark is protected by New York's dilution law.

■ Dilution can involve either blurring or tarnishment. *Id.* Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiffs' product." *Deere & Co. v. MTD Prod., Inc.,* 41 F.3d 39, 43 (2d Cir.1994) (emphasis omitted). "To determine the likelihood of blurring, we have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *N.Y. Stock Exch.,* 293 F.3d at 558. Tarnishment, on the other hand, occurs where a trademark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiffs' unrelated goods." *Id.* (citation omitted).

■ Here, plaintiffs press a blurring theory of dilution. As with their unfair competition claim, the relevant analysis has been covered in the previous discussion of the *Polaroid* factors. For the reasons discussed in that section of the Opinion, DBLV TM prevails on its New York dilution claim.[28]

tablished that defendants are liable for engaging in unfair competition, however, it is unnecessary to address whether DBLV has standing to bring the same claim. In any event, the parties have not briefed this issue.

28. Like the unfair competition claim, this claim was brought on behalf of both plaintiffs. Again, because DBLV TM has established defendants' liability, it is unnecessary to address

*Conclusion*

DBLV TM has shown it is entitled to a judgment in its favor against both defendants on its claims for trademark infringement under Section 32 of the Lanham Act; unfair competition under New York common law; and dilution under New York Gen. Bus. L. § 360–*l*.

SO ORDERED.